### RHODE ISLAND HOSPITAL TRUST NATIONAL BANK

v.

### EASTERN GENERAL CONTRACTORS, INC., et al.

#### No. 94–97–Appeal.

Supreme Court of Rhode Island.

April 25, 1996.

Paul M. Sanford, Stacey P. Nakasian, Providence, for Plaintiff.

John T. Walsh, Jr., Mark H. Grimm, Providence, for Defendant.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of the defendant/counter-claimant, Eastern General Contractors, Inc. (Eastern). Eastern has appealed from an order of the Superior Court that granted the motion for directed verdict of the plaintiff, Rhode Island Hospital Trust National Bank (Hospital Trust), and entered judgment for the plaintiff on Hospital Trust's petition for declaratory judgment and on Eastern's counterclaims. Eastern has further appealed the order of the Superior Court denying Eastern's motions for a new trial. For the reasons stated below, we sustain Eastern's appeal, vacate the judgment of the Superior Court, and remand the case for a new trial.

### Facts and Procedural History

In 1985, Eastern served as the general contractor on a construction project in Newport, Rhode Island. In connection with this project, Eastern engaged a subcontractor, Tolley Tree and Landscaping (Tolley). Eastern asked Tolley to post a performance bond for its work, but Tolley was unable to provide such a bond. In lieu of a performance bond, Eastern agreed to accept a standby letter of credit. Tolley obtained the credit, which was issued by Hospital Trust, through the account party, Future Real Estate (Future), a customer of Hospital Trust. Eastern was the named beneficiary on the credit. A letter to Eastern from Hospital Trust outlined the procedure by which Eastern could draw up to an aggregate amount of $100,000 on the credit account:

"This Credit is subject to the Uniform Customs & Practice for Documentary Credits (1983 Revision).

＊ ＊ ＊

"Your [referring to Eastern] drafts are to be accompanied by:

"The original of this credit No. S–3088, any amendments thereto and,

"A statement as follows:

"1. 'This drawing by Eastern General Contractors, Inc. is due to the default or failure to perform by Tolley Tree and Landscaping on project No. 5001, outside repair to housing, Naval Education Training Center, in accordance with contract dated March 13, 1985'

"2. An invoice or invoices presented to Eastern General Contractors, Inc., from the party completing the repairs marked 'Work not completed by Tolley Tree and Landscaping'

"Drafts must be drawn and presented to us at our counters not prior to September 5, 1985 nor later than September 30, 1985.

"Drafts drawn under this credit must bear on their face the clause 'Drawn under Rhode Island Hospital Trust National Bank credit No.S–3088 dated May 9, 1985.'"

Eastern, dissatisfied with Tolley's performance, terminated the contract with Tolley in July 1985. Thereafter, Eastern, as well as other companies, performed corrective work on the project. On Tuesday, September 24, 1985, Eastern prepared a presentation for payment under the letter of credit and posted the presentation to Hospital Trust the next day. Hospital Trust received the presentation on Thursday, September 26, 1985. Because Hurricane Gloria struck on Friday, September 27, Hospital Trust did not open for business on that day. On the next banking day—Monday, September 30, 1985—the expiration or "expiry" date occurred.

At trial, Hospital Trust's manager of trade-finance operations, Annette Veazey (Veazey), testified that she examined Eastern's presentation on the morning of Tuesday, October 1, 1985, and discovered three defects in the presentation: it was not accompanied by a draft, one of the invoices was addressed to Hospital Trust rather than to Eastern, and it did not specify the amount that Eastern wanted to draw. These discrepancies are noted on a worksheet dated October 1. The lead clerk in Hospital Trust's letter-of-credit department when these events occurred, one Marie Dalma (Dalma), testified that Veazey handed her Eastern's documents for the purpose of having another clerk, Ida Thornlimb (Thorn-

limb), "check them, double check them and call the beneficiary with the information." According to Dalma, Thornlimb was also to call the account party, Future, "to see if they [would] accept [the] discrepancies."

Sometime in the afternoon of October 1, Thornlimb telephoned Wayne Dorsett (Dorsett), Eastern's construction manager. The substance of the conversation that followed was disputed at trial. Thornlimb testified that she told Dorsett of the various discrepancies and that the bank would "hold the documents for his disposal." She testified that she had offered to prepare a draft for Dorsett's signature and that Dorsett had accepted her offer, but she averred that she had informed Dorsett that Future would have to waive the deficiencies in Eastern's presentation before Hospital Trust could pay Eastern.

Dorsett contested Thornlimb's account of the October 1 conversation. He testified that Thornlimb informed him that the presentation did not include the required sight draft, but that she would be willing to prepare one for his signature "so they could process this payment." Dorsett stated that there was no mention of any other discrepancies or of calling the account party. Although Hospital Trust routinely tape-recorded some telephone conversations, Hospital Trust was unable to produce a recording of the October 1 conversation between Dorsett and Thornlimb. If such a recording existed, it was destroyed prior to the initiation of this litigation.

A few days after his conversation with Thornlimb, Dorsett received the following letter, dated October 3, 1985, and signed by Dalma:

"Dear Mr. Dorsett,

"Enclosed please find draft for $77,689.53 dd September 24, 1985 to accompany documents against our letter of credit S–3088.

"Please sign and endorse same and return to our Trade Finance Dept. Attn: Ida Thornlimb by Federal Express so we may negotiate."

The letter was accompanied by an unsigned sight draft, backdated to September 24, 1985. The predated sight draft was then signed by

John Murphy, President of Eastern, and returned immediately to Thornlimb.

According to Thornlimb's testimony, she contacted Future's treasurer, Anna Mignanelli (Mignanelli), on October 8 and inquired of Mignanelli whether Future was willing to waive the discrepancies in Eastern's presentation, that is, whether Future would pay Eastern's demand despite the discrepancies. Mignanelli refused. On October 9, Hospital Trust, through Veazey, posted the following letter, notifying Dorsett that it would not satisfy Eastern's request for payment under the standby letter of credit:

"Re: Documents presented under S–3088

"Dear Mr. Dorset: [*sic*]

"The above referenced documents were presented with the following discrepancies:

"1. Draft not received within validity of Letter of Credit.

"2. Invoice addressed to R.I. Hospital Trust Nat'l Bank.

"Account party has not approved these discrepancies to date.

"We hold these documents at your disposal. Please advise."

Eastern continued to press Hospital Trust for payment, and on September 17, 1986, Hospital Trust brought the instant action, seeking a declaratory judgment that Eastern had failed to comply with the terms of the letter of credit and that this noncompliance justified Hospital Trust's denial of payment under the letter of credit. With its answer, Eastern filed a counterclaim, seeking payment under the letter of credit. A jury trial was held in the Superior Court from May 6 through May 21, 1993. On May 10, 1993, the Superior Court granted Hospital Trust's motion in limine to preclude Eastern from referencing or attempting to introduce any evidence relating to Hospital Trust's recording of telephone conversations between Eastern and Hospital Trust or relating to Hospital Trust's nonpreservation or destruction of such recordings.

At the close of evidence, the trial justice found that Eastern's presentation did not comport with the requirements of the letter of credit because of Eastern's failure to provide a sight draft with the presentation. He

thus declined to submit to the jury the question of whether Eastern substantially complied with the requirements of the letter of credit. The trial justice then submitted the following issues as interrogatories to the jury: first, whether Hospital Trust examined the documents of Eastern's presentation within a reasonable time after having received them; second, whether Thornlimb gave Eastern notice of discrepancies in the presentation and notice that Hospital Trust was holding the documents at Eastern's "disposal" during her October 1 telephone conversation with Eastern's Dorsett; and third, whether Thornlimb waived the September 30, 1985 expiration date of the letter of credit.

On May 21, 1993, the jury returned its verdict, wherein it answered the first two interrogatories in the affirmative and the third interrogatory in the negative. Then, after informing counsel of the substance of the jury's verdict, the trial justice announced that, during the jury's deliberations, he had received a written interrogatory from the jury concerning whether Thornlimb was required to use the precise phrase, "holding the documents at [Eastern's] disposal," during her October 1, 1985 telephone conversation with Dorsett. The trial justice stated that he did not inform counsel of the query but had responded in writing to the jury's request.

On June 3, 1993, the trial justice made independent findings that as a matter of law Hospital Trust had acted properly in denying payment to Eastern under the letter of credit. The trial justice then entered an order granting a declaratory judgment for Hospital Trust and directing a verdict for Hospital Trust on Eastern's counterclaims. Eastern filed three separate motions for a new trial, all of which the trial justice denied. Eastern filed a timely notice of appeal.

On appeal, Eastern alleged numerous errors on the part of the trial justice. We address three of the alleged errors: the directed verdict on the reasonableness, under the Uniform Customs and Practice for Documentary Credit (UCP), of Hospital Trust's examination of Eastern's presentation; the trial justice's instruction to the jury outside the presence of counsel; and the trial justice's decision to exclude any evidence or testimony relating to the existence or destruction of a recording of the October 1 telephone conversation between Thornlimb and Dorsett.

### "Reasonable Time" within the Meaning of the UCP

 A letter of credit, issued by a "bank or other person made at the request of a customer," is an instrument that ensures "that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." Uniform Commercial Code (UCC), G.L.1956 § 6A–5–103(1)(a). An additional characteristic of a standby letter of credit is that:

"Unlike the 'traditional' letter [of credit], which is issued to and routinely used as a payment procedure by remote buyers, the 'guarantee-standby' letter of credit has been used to create a fund from which the beneficiary of the letter may seek recourse for nonperformance by various other types of nonbuyer obligors including:

\* \* \*

b. *Contractors in construction* contracts to assure that the construction is duly performed." William C. Hillman, *Letters of Credit: Current Thinking in America* 61–62 (1987).

Hence, a standby letter of credit is more akin to a bond that ensures against mis-or nonperformance than to an account of credit from which a beneficiary regularly withdraws payments for goods or services.

The nature of standby letters of credit was elucidated further at trial through the testimony of Eastern's witness, John Donnelly (Donnelly), a former assistant vice president of Hospital Trust, qualified as an expert on letters of credit, who testified on common banking practices and on the requirements of the UCP. Donnelly stated that the purpose of a standby letter of credit is "generally to guarantee a performance." He further testified on the nature of standby letters of credit:

"[W]hen a stand-by letter of credit is drawn against, it's generally because there is a dispute involved. It's generally drawn

at the end of the validity of the letter of credit which is near the expiry date. * * * [T]here's always the possibility of litigation with a stand-by letter of credit."

Because of these implicit characteristics of standby letters of credit, Donnelly asserted that common and prudent banking procedure, consistent with the requirements of the UCP, would give such standby letters of credit priority over other types of credit and would ensure that the expiry date of a stand-by letter of credit would be ascertained immediately upon receipt of a presentation for payment. If the date of receipt was close to the expiry date of the credit, Donnelly testified, the presentation should be reviewed and "the appropriate actions should be taken." On the basis of his knowledge of the UCP and of common banking procedures, Donnelly testified that in his opinion Hospital Trust did not review Eastern's presentation within a reasonable time.

■ Donnelly's testimony notwithstanding, the trial justice directed a verdict for Hospital Trust, stating that Hospital Trust "acted within a reasonable time in responding to Eastern's presentation under the letter of credit, as the three-[day] banking period set forth in R.I. Gen. Laws (1992 Reenactment) § 6A–5–112(1)(a) is prima facie evidence of a reasonable period of time and plaintiff responded to Eastern's presentation within this time period." According to the trial justice, "[B]ecause Eastern's presentment to [Hospital Trust] was received when there were less than three banking days remaining before the expiration date of the letter of credit, Eastern assumed the risk that, if its presentation was defective, it would not receive notice of such defects in time to cure its defective presentation." The trial justice concluded that "as a matter of law, the bank acted within a reasonable time." Moreover, the trial justice placed significant emphasis on the UCC standard in his instructions to the jury. Eastern claimed on appeal that the trial justice inappropriately relied on § 6A–5–112(1)(a). We agree.

Section 6A–5–112(1)(a) states, "A bank to which a documentary draft or demand for payment is presented under a credit may without dishonor of the draft, demand, or credit: (a) Defer honor until the close of the third banking day following receipt of the documents." The letter of credit at issue in this case, however, is by its own terms subject to the UCP, not the UCC. Article 16(c) of the 1983 Reenactment of the UCP provides, *inter alia*, that "[t]he issuing bank shall have a reasonable time in which to examine the documents" submitted in a presentation for payment under a letter of credit. It is this "reasonable time" standard, not the three-banking-day standard of the UCC, that must govern the assessment of whether Hospital Trust acted appropriately in waiting until October 1 to examine Eastern's presentation.

■ The purpose of a standby letter of credit such as the one in this case is to provide a general contractor with a guarantee of a subcontractor's performance. The purpose of the reasonable-time provision of the UCP is "to give a beneficiary [of a standby letter of credit] a chance to cure a curable defect." *LeaseAmerica Corp. v. Norwest Bank Duluth*, 940 F.2d 345, 349–50 (8th Cir. 1991). In *LeaseAmerica*, the Eighth Circuit Court of Appeals refused to overturn a District Court finding that Norwest Bank had acted properly in denying payment under a letter of credit. The *LeaseAmerica* court stressed that the beneficiary's presentment "was untimely and incurable," and distinguished two cases that "involved timely presentment of documents with curable defects." *Id.* at 350.

One of the cases that the *LeaseAmerica* court distinguished, but also discussed with approval, was *Datapoint Corp. v. M & I Bank of Hilldale*, 665 F.Supp. 722 (W.D.Wis. 1987). *Datapoint* involved facts quite similar to those in the case at bar. A beneficiary under a letter of credit had made a presentment for payment one day before the credit's expiry date. Having found defects in the presentment, the bank did not honor the credit but notified the beneficiary of the dishonor by mail. Interpreting article 16(c) of the UCP, the *Datapoint* court held that the bank "was obligated to notify plaintiff [of the dishonor] without delay by telecommunication or, if that was impossible, by other expe-

ditious means." 665 F.Supp. at 727. The court stated that "[c]ommon experience would have suggested that it was unlikely that [the beneficiary] would receive this notice [by mail] in time to correct" the defect. *Id.*

Whether Hospital Trust acted on Eastern's presentation within a reasonable time was a question of fact for the jury. As the rationale of the *LeaseAmerica* and *Datapoint* decisions illustrates, the jury could have found that Hospital Trust violated the UCP's reasonable-time requirement irrespective of the fact that Eastern had submitted its presentment fewer than three banking days before the expiry date. In any case, the defects that Hospital Trust identified in Eastern's presentment were readily curable within the expiry date of the letter of credit, had Eastern been notified of the defects on the day Hospital Trust received the presentment. Consequently, we are persuaded that the appropriate rule that should be applied after viewing the totality of the specific circumstances in each case is the reasonable-time standard. *Alaska Textile Co., v. Chase Manhattan Bank,* 982 F.2d 813, 823 (2nd Cir.1992). We conclude, therefore, that the trial justice erred in directing a verdict for Hospital Trust and in ruling that the three banking days allowed for review under the UCC was "prima facie evidence of a reasonable period of time."

### Trial Justice's Instruction outside the Presence of Counsel

■ During its deliberations, the jury made a request for additional instructions. The trial justice described this event as follows:

"When I was on the bench handling [another] matter, the foreman [of the jury] wrote me a note and said during the October 1st, 1985 telephone conversation, was Ida Thornlimb required in so many words to state, 'Is holding the documents at the disposal of' or 'is holding' adequate. I responded from the bench without conferring with counsel as follows: She had to inform the beneficiary that the bank has [*sic*] holding the documents at the disposal of the beneficiary. These words are not mandatory. The concept, we are holding them—the concept is we are holding them awaiting your instructions. So long as that concept was conveyed. I answered that in that fashion. I note the exception of both counsel because I did not have an opportunity to confer with them before I wrote out the answer."

The trial justice responded in writing from the bench without conferring with counsel and without counsel present. In fact, counsel were not even made aware of the jury's request or of the trial justice's response until after the jury had reached a verdict. Moreover, the trial justice's written response was, according to the jury foreman, discarded "in the basket" and apparently never retrieved.

Clearly, the jury's request concerned a substantive question at the heart of the issue in controversy, namely, what was required specifically of Hospital Trust in notifying Eastern of the credit's dishonor and of the reasons for the dishonor. Our careful review of the record reveals no evidence of the content of the jury's request or of the trial justice's response, other than the trial justice's description of those events. Without such a record, there is no basis on which this Court can engage in a meaningful review of the trial justice's instruction.

Rule 51 of the Superior Court Rules of Civil Procedure provides that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." In this instance, the trial justice issued the instruction, and the jury completed deliberations before counsel even became aware of the jury's request. Counsel had no opportunity to object to the substance of the instruction or to attempt to persuade the trial justice of the instruction's merit or lack thereof.

We view with grave concern the issuance of a jury instruction on a question of law, which instruction was not preserved for review on appeal. Such concern was identified by this Court in 1922 in *Macchia v. Ducharme,* 44 R.I. 418, 117 A. 651 (1922). In that case, this Court held that a trial justice's

failure either to notify counsel before issuing further instructions after the jury had begun its deliberations or to preserve the instruction by some other means was reversible error. *Id.* at 423, 117 A. at 653. Consistent with our holding in *Macchia*, we conclude that the trial justice erred in responding to the jury's request outside the presence of counsel and without preserving his instruction.

### Exclusion of Evidence of the Alleged Destruction of the Recording

We next address the trial justice's *in limine* exclusion of evidence or testimony anent Hospital Trust's possible recording of the October 1, 1985 telephone conversation between Thornlimb and Dorsett. The substance of the October 1 conversation was clearly relevant to the determination of whether Hospital Trust acted reasonably in its review and dishonor of Eastern's presentment. Although it is unclear whether Hospital Trust did, in fact, record the October 1 conversation,[1] we are of the opinion that Eastern was entitled to present to the jury evidence that a recording may have existed but was subsequently destroyed.

Under the doctrine *omnia praesumuntur contra spoliatiorem*, "all things are presumed against a despoiler," the destruction of relevant evidence by a party to litigation may give rise to an inference that the destroyed evidence would have been unfavorable to the position of the spoliating party. *E.g. Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76, 78 (3rd Cir.1994); *Akiona v. United States*, 938 F.2d 158, 160–61 (9th Cir.1991), *cert. denied*, 503 U.S. 962, 112 S.Ct. 1567, 118 L.Ed.2d 212 (1992); *Welsh v. United States*, 844 F.2d 1239, 1245–46 (6th Cir.1988); *Nation–Wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 217–18 (1st Cir.1982). Although a showing that a party has destroyed evidence in bad faith or in anticipation of trial may strength-

en the spoliation inference, *Miller v. Montgomery County*, 64 Md.App. 202, 214, 494 A.2d 761, 768, *cert. denied*, 304 Md. 299, 498 A.2d 1185 (1985), such a showing is not essential to permitting the inference. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993); *Nation–Wide Check Corp.*, 692 F.2d at 219. The Sixth Circuit Court of Appeals stated in *Welsh*, "Destruction of potentially relevant evidence obviously occurs along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality." 844 F.2d at 1246. In any case, we make no determination here as to whether Hospital Trust's alleged destruction of evidence would give rise to an adverse inference, nor do we suggest the weight of any such inference. We are of the opinion, however, that the doctrine supports our conclusion that, at the very least, such evidence should not have been withheld from the jury.

In conclusion, for the reasons stated above, we sustain Eastern's appeal and vacate the judgment of the Superior Court. The case is remanded to the Superior Court for a new trial.

FLANDERS, J., did not participate.

---

1. In an April 30, 1993 deposition, Barbara Amaral (Amaral), Hospital Trust's telecommunications manager, testified that Hospital Trust's letter-of-credit department was one of eight departments connected to a Dictaphone recording system that automatically recorded all conversations on connected telephones. In deposing Amaral, Eastern's counsel referenced the deposition of another Hospital Trust employee, Theresa Colardo, which testimony indicated that the October 1, 1985 conversation had been recorded. Amaral, however, was "not sure how many phones were tape recorded" in Hospital Trust's letter-of-credit department in 1985, and she had no knowledge of whether the particular telephone on which Thornlimb spoke to Dorsett was connected to the recording system.