Johnny Frank GARRETT,
Petitioner–Appellant,

v.

James A. LYNAUGH, Director, Texas
Department of Corrections,
Respondent–Appellee.

No. 87–1680.

United States Court of Appeals,
Fifth Circuit.

March 31, 1988.

Jeff Blackburn, Selden Hale, Amarillo, Tex., for petitioner-appellant.

Robert S. Walt, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for respondent-appellee.

Before GEE, JOHNSON, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Petitioner, Johnny Frank Garrett, appeals from the denial of his habeas corpus petition under 28 U.S.C. § 2254. Garrett is under a sentence of death on his conviction for murder committed during the course of rape and burglary. The district court denied habeas relief but granted a stay of execution and a certificate of probable cause. After thorough consideration of petitioner's contentions, we affirm the denial of the writ of habeas corpus and dissolve the stay of execution.

## I.

The nude body of Sister Tadea Benz was found in her bedroom on the second floor of the St. Francis Convent in Amarillo, Texas, at approximately 7:00 a.m. on October 31, 1981. Sister Benz was seen alive late the previous evening.

Although there was blood on Sister Benz' face, the nun who discovered her body did not suspect foul play and the body was transported to a funeral home. An hour or so later the sisters found a broken window, unlatched and open, in the community room located on the first floor of the convent and called the Amarillo police. The police arrived at approximately 9:00 a.m. and secured the crime scene. The police recovered bed linens, the victim's night clothes, and a kitchen knife under the bed. Fingerprints and palm prints were lifted from the knife blade and handle and from the bed headboard. Also, the cut window screen and a second knife—a steak knife—were found in the convent driveway.

By the time the body was recovered from the funeral home it had been partially cleansed and arterial embalming completed. The autopsy revealed multiple injuries, including contusions to the head, stab wounds to the chest, and excoriation and abrasive injuries to the front and back of the neck. The pathologist, Dr. Erdmann, determined that death was caused by manual strangulation.

The autopsy also revealed evidence of forcible rape. Dr. Erdmann found signs of external bleeding and internal trauma in the vaginal area. Tests of vaginal contents revealed the presence of sperm and prostate secretions. No test was conducted from the vaginal contents designed to determine the assailant's blood type.

The evidence against the accused was overwhelming. Garrett was seen running from the direction of the convent on the night of the murder. Prints found on the handle and blade of the kitchen knife recovered from under the victim's bed and prints from the bed headboard matched Garrett's. Pubic hairs recovered from the scene were determined to have the same individual characteristics as Garrett's. The steak knife found in the driveway of the convent was of the same manufacture, design and make, and had the same degree of use as another steak knife recovered from Garrett's residence.

The state also offered the testimony of Lonnie Watley, an inmate and trusty of the Potter County Jail during Garrett's pretrial incarceration. Watley testified that Garrett originally denied committing the offense, but eventually admitted to breaking into the convent and killing the nun.

Garrett testified in his own defense and denied raping or murdering Sister Benz. Garrett testified that he entered the convent two days before the murder looking for items to steal. According to his testimony, he entered the convent through the

front door shortly after noon and proceeded into the medication room and the cafeteria, where he picked up the kitchen knife. He testified that he then went into several of the bedrooms. In one bedroom he bent the knife in prying open a locked drawer. He explained his fingerprints on the headboard of Sister Benz' bed by stating that he grabbed the headboard so he could lean over and reach a cross on the wall. He testified that he heard a noise in the convent and fled. Garrett testified that he went to his mother's house at approximately 10:20 p.m. on October 30 and did not leave until later the next morning.

The state sought to impeach Garrett with an oral statement that he allegedly gave the police shortly after his arrest on November 9, 1981. Two police officers testified that, after they reduced Garrett's statement to writing, Garrett agreed that it was true but refused to sign it until after he consulted counsel. After consulting counsel, Garrett declined to sign the statement. In the statement attributed to Garrett by the police, Garrett admitted breaking into the convent by knocking out a window on the bottom floor. He admitted going into a nun's room. He stated that:

> There was a nun in bed and she acted as if she was going to scream. I covered her mouth so she couldn't make any noise.
>
> I started choking her until she passed out. I had sex with her. I left the convent the way I came in.

Garrett denied making the statement. He testified that the police officer would "say something, and I would say, 'put it down,' he would say something else and I said 'go ahead and put it down.' Then he said 'sign this.' I said, 'I ain't signing nothing.'"

On rebuttal Sister Bernice Noggler testified that, contrary to Garrett's testimony, the front door of the convent is ordinarily locked and no one could enter the cafeteria around the noon hour without being noticed. She also denied that any of the chests in the convent were locked or that any valuables had been reported missing. She also denied that Sister Benz ever

had a cross hanging above her headboard. The state also presented rebuttal witnesses who lived near Garrett's mother. One neighbor testified that Garrett was seen prowling around an elderly woman's home in the neighborhood on the night of the murder. The second neighbor testified that Garrett came to his house at approximately 11:00 the same evening.

At the punishment phase of the trial the government offered testimony of Garrett's bad reputation in the community and his past acts of aggression. The defense presented Garrett's mother, who made a personal plea for mercy on Garrett's behalf and testified about his relationship with his brothers and sisters. The defense also called several officers who testified that Garrett had caused no trouble while awaiting trial in the Potter County jail.

As required by the jury's verdict, the trial court imposed a death sentence. The conviction and sentence were affirmed by the Texas Court of Criminal Appeals. *Garrett v. State*, 682 S.W.2d 301 (Tex.Crim. App.1984). A petition for writ of certiorari was denied by the United States Supreme Court. *Garrett v. Texas*, 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985). Garrett then sought habeas relief in the state court on a number of grounds. All relief was denied by the trial court and the Texas Court of Criminal Appeals. The instant federal petition for habeas relief was initially filed in the Southern District of Texas. A stay of execution was entered and the action was transferred to the Northern District of Texas. Following an evidentiary hearing, the district court denied habeas relief on all claims. The trial court rescheduled Garrett's execution for October 30, 1987, but the district court granted a stay of that execution pending appeal and also granted petitioner's application for a certificate of probable cause.

Although Garrett sought habeas relief on a number of claims in the district court, he restricts his appeal to this court to a single claim: By destroying potentially exculpatory evidence, the state denied him a fair trial and deprived him of due process of law.

## II.

Garrett argues that the state deprived Garrett of potentially exculpatory evidence because the state pathologist failed to test the deceased's vaginal contents for the rapist's blood type or to preserve the specimen so that the defense could have those tests conducted.

The district court held a hearing on the facts surrounding the autopsy. When Sister Benz' body was recovered from the funeral home it was sent to Dr. Ralph Erdmann, a pathologist on retainer with Potter County, for an autopsy. After Dr. Erdmann found external evidence of a rape he injected saline solution into the vaginal vault and recovered a small quantity of fluid. From these vaginal washings Dr. Erdmann tested for the presence of sperm and prostate secretions and found both. In making these tests, Dr. Erdmann used the entire vaginal contents sample he recovered from Sister Benz' body.

Garrett's argument is straightforward: If Dr. Erdmann had tested the samples for the assailant's blood type and those tests had revealed that the assailant had a blood type different from Garrett's, the evidence would have been absolutely exculpatory. Garrett argues that under *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the failure of the state to make this test or preserve enough of the sample for Garrett to conduct the test denied him a fundamentally fair trial.

In *Trombetta* the Court considered whether the due process clause requires law enforcement agencies to preserve breath samples of suspected drunken drivers for later inspection and tests by the accused in order for the state to admit the results of breath analysis tests in criminal prosecutions. The Court held that the Constitution requires a state to preserve "[material] evidence that might be expected to play a significant role in the suspect's defense." Id. at 489, 104 S.Ct. at 2534. Evidence meets the materiality standard for these purposes if it possesses an "exculpatory value that was apparent before the evidence was destroyed, and be of such nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id.

Garrett's reliance on *Trombetta* is misplaced. No evidence was destroyed in the *Trombetta* sense. Dr. Erdmann completely used the available sample in making the tests that he considered necessary. Stated another way, there was in this case no evidence (whether or not potentially exculpatory) left for the state to preserve once Dr. Erdmann had used up the sample. *Trombetta* does not require a state to conduct its investigation in any particular way or perform tests on raw data in any particular order. Nor does it require a state to conduct additional or more comprehensive tests.

The district court correctly denied habeas relief on this claim.

## CONCLUSION

The district court's denial of habeas corpus relief to the petitioner is affirmed; the stay of execution is vacated.

AFFIRMED. STAY VACATED.