**STATE**

v.

**Christopher BARNES.**

No. 99–469–C.A.

Supreme Court of Rhode Island.

May 23, 2001.

Aaron L. Weisman, Providence, for Plaintiff.

David N. Cicilline, Bristol, for Defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In this appeal, the state seeks review of a Superior Court trial justice's decision granting the defendant's pretrial motion to suppress evidence.

## I

### Case Facts and Travel

On February 21, 1997, a Providence County grand jury indicted Christopher Barnes (Barnes or defendant), charging him with first-degree sexual assault upon Jane Jones (Jones),[1] a first-year student at

---

1. The name "Jane Jones" is fictitious and used herein to protect the identity and privacy of the alleged victim.

Brown University. The state alleges that in the early morning of October 6, 1996, Ms. Jones was present at a fraternity party at Brown. At some point during the party, while Ms. Jones was dancing with Barnes, he allegedly asked her if she wanted to go to his brother's room on an upper floor in the fraternity house. She declined, left Barnes, and went into a nearby bathroom. She asserted that Barnes followed her into the bathroom and there forcibly raped her. During the alleged sexual assault, another guest at the party unexpectedly interrupted the ongoing assault, enabling Ms. Jones to escape. She reported the incident to the university police, but did not know the name of her alleged attacker. On November 7, 1996, following a police investigation, Ms. Jones was shown a "photo pack" of possible suspects, and she identified the defendant Barnes from the photo pack. He subsequently was arrested and charged, and later, on February 21, 1997, was indicted for first-degree sexual assault.

After his indictment, Barnes moved to dismiss the indictment or, in the alternative, to suppress the state's evidence of seminal fluid that had been found on the crotch area of the pantyhose worn by Ms. Jones during the alleged sexual assault. Preliminary testing procedures employed by the Rhode Island Department of Health (Health Department) had presumptively determined that a small stain found on the pantyhose was semen, but did not and could not identify the semen as being that of the defendant or any other particular person. Barnes's motion to dismiss the state's indictment centered on his contention that because the preliminary testing procedures employed by the state Health Department had depleted the small stain found on the pantyhose, he was deprived of the opportunity to subject the stain to DNA analysis, the result of which might have exonerated him of the charge. In essence, he advanced a theory of spoliation of crucial evidence by the state, and claimed that the state's indictment should thus be dismissed.

Alternatively, Barnes, in his motion, had requested that should his motion to dismiss the indictment fail, the state's evidence of semen that was found on the crotch area of the pantyhose should at least be suppressed because of the state's inability to positively identify the semen as being his.

At the conclusion of the suppression hearing, the trial justice, in a rather cryptic bench decision, denied Barnes's motion to dismiss the indictment, but granted his motion to suppress the evidence concerning the semen found on the crotch of Jones's pantyhose. The state's appeal followed.

## II

### The Evidence Suppression

In this case the trial justice suppressed introduction of the state's expert witness testimony that was expected to establish the existence of semen found on the crotch of the pantyhose worn by the victim during the alleged sexual assault. That testimony was expected to be proffered by witnesses employed in the forensic biology section of the state Health Department, who had examined and tested a small stain found on the pantyhose and found that it contained semen. In any criminal prosecution, it is clear that the state is entitled to offer, and seek to introduce, all relevant evidence that is probative to prove each of the necessary elements in the particular crime that is charged. *State v. Young*, 743 A.2d 1032, 1036 (R.I.2000).

Rule 702 of the Rhode Island Rules of Evidence permits witnesses who

are qualified in a particular field of scientific specialty to testify and render expert opinions on matters within the realm of their particular skill, training, experience or knowledge, and which will assist a trial jury in understanding the trial evidence or in determining a material fact in issue. *State v. Botelho*, 753 A.2d 343, 347 (R.I. 2000). Such evidence generally ought to be admitted, unless its relevancy and probative value is found to be outweighed by any substantial and undue prejudice that it may have upon the trial jury's deliberations. R.I. R.Evid. 403. When, as concerned here, a trial justice elects to suppress such evidence for reason that its potential prejudicial effect upon the trial jury will outweigh its relevancy, we accord deferential review to the trial justice's discretionary findings that are made in support of his or her decision. *See Botelho*, 753 A.2d at 347 (citing *State v. Collins*, 679 A.2d 862, 867 (R.I.1996)); *see also State v. Bettencourt*, 723 A.2d 1101, 1108–09 (R.I. 1999).

Nonetheless, in *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188 (R.I.1994), we said of a trial justice's discretion exercised in a suppression hearing pursuant to Rule 403 that:

"Although the trial justice may have discretion pursuant to Rule 403 to exclude evidence whose prejudicial effect outweighs its relevance, such discretion must be exercised sparingly. The determination of the value of evidence should normally be placed in the control of the party who offers it. Unless evidence is of limited or marginal relevance and enormously prejudicial, the trial justice should not act to exclude it." *Wells*, 635 A.2d at 1193.

In the case now before us, we are hard-pressed to fully comprehend from the trial justice's rather cryptic decision his basic reason for granting the defendant's motion to suppress the state's evidence concerning the semen found on the crotch of the alleged victim's pantyhose. Certainly that evidence was both relevant and probative to establish whether sexual intercourse, consensual or forced, had taken place between the alleged victim and the defendant, whom she had identified as her alleged assailant. The fact that an act of sexual intercourse did in fact take place was an essential element for the state to prove in its first-degree sexual assault charge against the defendant. The trial justice, however, appears to have founded his decision to suppress upon his understanding that the state's forensic biologists could not determine that the semen found on the pantyhose was that of the defendant and that Ms. Jones, the alleged victim, "could not identify it to this defendant." How he expected Ms. Jones to be able to identify the semen as being that of the defendant was left unexplained. What is clear, however, is that in every pretrial statement given to the police and prosecutors by Ms. Jones, she consistently said that no male ever had touched the pantyhose that she was wearing before the time of the sexual attack, and she identified her attacker, at that time, as the defendant. Thus, if at trial, the trial jury accepted as credible Ms. Jones's account of what had transpired in the fraternity bathroom between the defendant and herself, the origin of the semen and its connection to the defendant Barnes would be established, not directly by the forensic biologists, but, instead by the trial jury, as the fact-finders.

■ We are satisfied, after considering the scant and rather nebulous analysis provided by the trial justice to support his decision to suppress the state's evidence, that he improperly exercised his discretion. To prove the charge made in the indictment against the defendant, the state

was required to prove beyond a reasonable doubt the first basic and essential element of the offense, namely, that an act of intercourse involving Ms. Jones had occurred at the time in question. That fact had to be proved even if the defendant was not disputing that particular element of the offense. *See State v. Mora,* 618 A.2d 1275, 1280 (R.I.1993); *see also State v. Lionberg,* 533 A.2d 1172, 1180 (R.I.1987). Whether at trial the state will be able to prove that Barnes was a party to that intercourse, or was the actual perpetrator of the alleged sexual assault, or the donor of the semen, was not in issue before the trial justice at the time of the defendant's motion to suppress. What was before him was the question of the admissibility of evidence of semen found on the victim's pantyhose that would be offered at trial by the state to prove that an act of sexual intercourse involving Ms. Jones and a male had taken place at the time of the alleged offense.

▪▪▪ When acting upon a pretrial motion to suppress relevant evidence that is necessary for the state to prove an essential element of a charge made against a defendant, the hearing justice should set out clearly his or her reasons for granting or denying such motions. Unless that is done, we will be hard-pressed to find in bland generalizations whether the hearing justice properly has exercised his or her discretion. A hearing justice's discretion, we caution, "is not exercised by merely granting or denying a party's request." *Hartman v. Carter,* 121 R.I. 1, 4–5, 393 A.2d 1102, 1105 (1978).

"The term 'discretion' imports action taken in the light of reason as applied to all the facts and with a view to the rights of all the parties to the action while having regard for what is right and equitable under the circumstances and the law." *Id.* at 5, 393 A.2d at 1105.

Simply because evidence of semen found on the pantyhose of a victim may later at trial prove to be prejudicial to a defendant does not, *ipso facto,* render it inadmissible. *See Young,* 743 A.2d at 1036. We conclude that the hearing justice in this case abused his discretion in granting the defendant's motion to suppress.

## III

### Spoliation of Evidence

Notwithstanding the clear, relevant, and probative value of the challenged semen evidence, the defendant contends that it should nonetheless be suppressed because the "State knowingly depleted the evidence" and "destroyed any possibility that the accused, Christopher Barnes, [would] be able to exonerate himself completely." More specifically, the defendant argues:

"[A]lthough the State could have conducted the DNA tests first, it chose to run three preliminary, cumulative tests just to identify and confirm the identity of the fluid found on complainant's pantyhose. * * * Had the State analyzed the DNA first, the analysis would have included or excluded Mr. Barnes as the source of the semen found on the complainant. * * * Clearly, had the State identified Mr. Barnes as the source of the fluid found on the inner crotch of the complainant's pantyhose, the type of the fluid would not have mattered. Christopher Barnes, who had not met the complainant prior to the night in question, would have been unable to explain the presence of his bodily fluid, whatever the type, on the inside of the complainant's pantyhose. Instead, the State destroyed all the evidence doing cumulative, unnecessary tests."

We disagree.

In *Tancrelle v. Friendly Ice Cream Corp.,* 756 A.2d 744 (R.I.2000), we recently

addressed the principle of spoliation of evidence. We noted:

"Under the doctrine *omnia praesumuntur contra spoliatorem,* '[a]ll things are presumed against a despoiler or wrongdoer,' Black's Law Dictionary 1086 (6th ed.1990), the deliberate or negligent destruction of relevant evidence by a party to litigation may give rise to an inference that the destroyed evidence was unfavorable to that party." *Tancrelle,* 756 A.2d at 748.

■ We have also previously noted that "the doctrine of spoliation merely permits an inference that the destroyed evidence would have been unfavorable to the despoiler" but does not make that inference conclusive. *New Hampshire Insurance Co. v. Rouselle,* 732 A.2d 111, 114 (R.I. 1999); *see also State v. Langlet,* 283 N.W.2d 330, 333 (Iowa 1979); 29 Am. Jur.2d *Evidence* § 244 (1994). If spoliation is established, "the fact finder may [then] draw the inference that the evidence destroyed was unfavorable to the party responsible for its spoliation." *Langlet,* 283 N.W.2d at 333. Such a presumption or inference ordinarily would arise where the act was intentional or intended to suppress the truth, but "does not arise where the destruction was a matter of routine with no fraudulent intent." *See* 29 Am. Jur.2d *Evidence* § 244 at 256.

In contrast, "it is generally held that the necessary consumption or destruction of the evidence in state crime laboratory tests does not violate the accused's rights, even though the accused is thus prevented from subjecting any of the hard physical evidence to tests by his own expert." Annotation, *Consumption or Destruction of Physical Evidence Due to Testing or Analysis by Prosecution's Expert as Warranting Suppression of Evidence or Dismissal of Case against Accused in State Court,* 40 A.L.R.4th 594, 597 (1985); *see*

*also People v. Griffin,* 46 Cal.3d 1011, 251 Cal.Rptr. 643, 761 P.2d 103, 107 (1988); *State v. Dechaine,* 572 A.2d 130, 133 (Me. 1990); *Commonwealth v. Gordon,* 422 Mass. 816, 666 N.E.2d 122, 136 (1996); 29A Am.Jur.2d *Evidence* § 1006 (1994).

In this case, at the pretrial suppression hearing, Robin Smith (Smith), the supervisor in the forensic biology section of the state Health Department, testified that the state Health Department conducted an examination on the miniscule stain found on the crotch area of the pantyhose. She testified that it was proper protocol for the state Health Department, when presented with a piece of evidence containing an unknown substance in a sexual assault case, to first conduct a series of "presumptive" tests to determine the exact identity of any suspected substance. Accordingly, Smith and another laboratory technician, Jennifer Finch, conducted first both a visual examination of the pantyhose, and later, an ultraviolet test, which detected the presence of bodily fluids that would not have been apparent to the naked eye.

Smith then performed an "acid phosphatase" test, also an identification test, by removing a small portion of the stain onto a swab and testing that portion for the presence of "acid phosphatase." Although she acknowledged that there was a "possibility" that the stain sample could be consumed by this test, Smith testified that she would not have been able to say "that before doing the test I was going to use up all the sample." Smith also testified that it is proper protocol to perform the acid phosphatase test and characterized it as a "very useful screening tool" because "acid phosphatase" is present in other bodily fluids, but is found in a "higher quantity in semen." She also testified that the test was "necessary" because "it's a guide for us in terms of locating stains" and then for performing "a positive confirmatory I.D.

on that same cutting." Accordingly, after performing the acid phosphatase test, Smith conducted a "confirmation test," using the same sample that had been used for the acid phosphatase test. The result of these tests conclusively established that the substance deposited on the pantyhose was seminal fluid.

After completing the tests that enabled it to determine that the foreign substance on the pantyhose was seminal fluid, the state Health Department sometime thereafter received a request from the Attorney General's office to conduct a DNA analysis on the pantyhose stain to ascertain whether the defendant could be the source of the seminal fluid on the pantyhose. Smith testified that she informed the Attorney General's office that there was not enough of a sample left to do the DNA testing and that the seminal fluid sample had been consumed by the acid phosphatase test. She further testified that the state Health Department had never at any time received any request from defense counsel to conduct a DNA analysis on the stain sample.

In this case, the "preliminary" tests that were conducted were necessary to identify both the existence and then the nature of the fluid deposited on the pantyhose. A DNA test alone, without the prior identification tests, would have left for pure speculation whether the nature of the deposited substance was saliva, blood, semen or other bodily fluid.

■ Concerning Barnes's suggestion of evidence spoliation on the part of the state, we conclude from the record that no evidence exists to support the contention that the state Health Department laboratory personnel intentionally, negligently or in "bad faith" consumed the miniscule sample of seminal fluid. *See Smith v. State,* 270 Ga. 68, 508 S.E.2d 145, 148 (1998); *State v. Boyd,* 359 So.2d 931, 945 (La.1978). The

mere fact that the state's expert, Ms. Smith, testified that she knew that performing the acid phosphatase test "possibly" could consume the stain sample was an insufficient basis upon which to deny admission of the test results at trial. *See Smith,* 508 S.E.2d at 148.

■ We also emphasize that the sample in this case was particularly minute and difficult to perform any tests on, including routine identification examination tests. Indeed, the pretrial record reveals that the sample in question was consumed merely by the performance of a single acid phosphatase test. "Where there is only enough material to perform one test, an independent test is impossible and, thus, admission of the test results does not violate the defendant's due process rights." *Smith,* 508 S.E.2d at 148.

■ We further conclude that the state Health Department was not required to conduct its testing procedures in any particular order, or first to undertake a preliminary investigation to determine in what order the testing should proceed, as the defendant contends. In *Garrett v. Lynaugh,* 842 F.2d 113 (5th Cir.1988), the Circuit Court in that case affirmed the denial of a defendant's application for writ of habeas corpus following his conviction for murder committed during the course of rape and burglary, and rejected the defendant's contention that the state had deprived him of potentially exculpatory evidence because the state pathologist failed to test the victim's vaginal contents for the rapist's blood type or to preserve the specimen so that the defense could have that test conducted. *See id.* at 116. The Circuit Court also rejected the defendant's contention that the failure of the state in that case to perform such testing, or to preserve enough of the test sample for the defendant to conduct his own test, denied

him a fundamentally fair trial. *See id.* In that case, the state pathologist had found external evidence of a rape and then had injected saline solution into the victim's vagina and recovered a small quantity of unknown fluid. *See id.* From this fluid, the pathologist first tested for the presence of sperm and prostate secretions and found both, but in the course of testing used up the entire sample of fluid and was unable to conduct further examinations, including a blood-type test. *See id.* In rejecting the petitioner's contentions, the Circuit Court reasoned that the state pathologist had not "destroyed" any evidence, but had rather

> "completely used the available sample in making the tests that he considered necessary. Stated another way, there was in this case no evidence (whether or not potentially exculpatory) left for the state to preserve once Dr. Erdmann had used up the sample. *Trombetta* does not require a state to conduct its investigation in any particular way or perform tests on raw data in any particular order. Nor does it require a state to conduct additional or more comprehensive tests." *Garrett,* 842 F.2d at 116.

In this case, the state's forensic laboratory technicians, following the laboratory's well-established protocol, first undertook to conduct tests to identify the type of fluid stain that was found on the alleged victim's pantyhose rather than to initially perform a DNA analysis of the unknown fluid. Absent any court order or authority to the contrary, it had clear discretion and responsibility to make the decision about what initial tests should be conducted.

We also note that in this case, that the Attorney General's office did not request DNA testing until sometime after the sample already had been consumed, and that the defendant never had requested the state to perform any DNA analysis of the

stain. We are satisfied that under these circumstances the state laboratory had no duty to undertake DNA testing on the stain, absent any authorized request to do so from the Attorney General or defense counsel, or by court order. *See Garrett,* 842 F.2d at 116; *see also Boyd,* 359 So.2d at 945.

The defendant at a trial in this case will have full opportunity to vigorously examine and/or cross-examine Ms. Smith, and to challenge the reliability of the tests that were performed on the semen-stained pantyhose. Presumably, on the basis of the record before us, no state prosecution expert witness will testify that the seminal fluid on the pantyhose is that of the defendant. To connect the semen to the defendant, the trial jury first will have to determine whether Ms. Jones's trial testimony concerning the incident is credible, in particular, that Barnes's penis was the only penis that ever had come in contact with the pantyhose that she was wearing at the time of the sexual assault. If the trial jury finds her testimony to be credible, the relevancy and materiality of the semen evidence that was found on the pantyhose then will be established and accorded its proper evidentiary value by the trial jury.

## IV

### Conclusion

For the foregoing reasons, the state's appeal is sustained. The order suppressing the state's introduction at trial of evidence of semen found on the alleged victim's pantyhose is vacated. The papers of this case are remanded to the Superior Court for proceedings consistent with this opinion.