Mary M. KURCZY, Individually and
as parent and next friend of
Lucas Landry, a minor

v.

ST. JOSEPH VETERANS
ASSOCIATION, INC.

No. 2000–387–Appeal.

Supreme Court of Rhode Island.

April 15, 2003.

Ronald J. Resmini, Providence, for Plaintiff.

Joseph C. Salvadore, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

After a remand and a second Superior Court jury trial in this premises-liability case, we revisit on appeal the facts and law that we first encountered in *Kurczy v. St. Joseph Veterans Association, Inc.*, 713 A.2d 766, 772 (R.I.1998) (*Kurczy I*). But this time, in contrast to the result in *Kurczy I*, the jury returned a verdict for the plaintiff, Mary M. Kurczy, in her capacity as the mother and next friend of the injured victim, Lucas Landry (Lucas). Lucas was a ten-year-old boy in 1990 when he injured himself by plunging to the bottom of a darkened outdoor stairwell during a nighttime wedding reception on the defendant's premises.

The defendant, property owner St. Joseph Veterans Association, Inc., appeals from the judgment for damages that entered on the jury's verdict. Adhering to the kitchen-sink school of legal advocacy, defendant apparently decided to throw up against our appellate wall as many possible arguments as it could squeeze into the fifty pages of briefing allowed by this Court, hoping that one or more of them might stick. Thus, accusing the trial justice of committing a host of reversible errors during the second trial, defendant articulates seventeen separate reasons why we should vacate the judgment in plaintiff's favor.

Rejecting these arguments *en toto* for the reasons illumined in this opinion, we affirm the judgment and deny the appeal. We also deny plaintiff's cross-appeal, holding that when, as here, a party has appealed from a final judgment adjudicating the rights of the parties, post-judgment interest does not begin to accrue until we affirm that judgment or dismiss the appeal, whichever first occurs. *See, e.g., Rhode Island Insurers' Insolvency Fund v. Leviton Manufacturing Co.*, 813 A.2d 47, 49 (R.I.2003) (per curiam).

## I

### Denial of Defendant's Motions for Judgment as a Matter of Law

At the close of plaintiff's case-in-chief, and again at the close of all the

evidence, defendant moved for judgment as a matter of law. On both occasions, defendant argued that the trial justice should enter judgment in its favor because plaintiff had failed to introduce sufficient evidence to prove each of the elements required to establish negligence in this premises-liability case. These elements included, according to defendant, some sort of a pre-incident notice to defendant concerning an allegedly dangerous artificial condition existing on the premises. As we previously have held, however, actual notice is not always a condition precedent to liability in these situations. *See Tancrelle v. Friendly Ice Cream Corp.,* 756 A.2d 744, 752 (R.I.2000). Rather, premises-liability law in Rhode Island imposes an affirmative duty upon owners and possessors of property:

> "to exercise reasonable care for the safety of persons reasonably expected to be on the premises * * * includ[ing] an obligation to protect against the risks of a dangerous condition existing on the premises, provided the landowner knows of, or by the exercise of reasonable care would have discovered, the dangerous condition." *Id.* (citing *Cutroneo v. F.W. Woolworth Co.,* 112 R.I. 696, 698, 315 A.2d 56, 58 (1974)).

In this case, defendant argued that plaintiff did not produce sufficient evidence to establish that it either knew or should have known that a dangerous condition existed on the premises before Lucas's fall. And even if it had such notice, it argued, it still had to be afforded a reasonable time thereafter either to remedy the danger or to warn of its existence.

 When considering a motion for judgment as a matter of law, the trial justice must examine:

> "the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credi-

bility of witnesses, * * * draw[ing] from the record all reasonable inferences that support the position of the nonmoving party. * * * If, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion for [judgment as a matter of law] must be denied, and the issues must be submitted to the jury for determination." *Marketing Design Source, Inc. v. Pranda North America, Inc.,* 799 A.2d 267, 271 (R.I.2002) (quoting *Martinelli v. Hopkins,* 787 A.2d 1158, 1165 (R.I.2001)).

Thus, the trial justice should grant such a motion for judgment as a matter of law and dismiss the claims in question only when, " 'no relevant issues of fact exist and defendant is entitled to judgment as a matter of law * * *.' " *Id.* at 272–73. In reviewing a trial justice's decision on this score, "we are 'bound by the same rules and [standards] as the trial justice.' " *Id.* at 272.

 After analyzing the evidence in the light most favorable to plaintiff, the trial justice denied defendant's first motion for judgment as a matter of law at the close of plaintiff's case-in-chief. In doing so, the trial justice observed that the jury had heard conflicting evidence concerning the lighting situation that prevailed in the outside stairwell area adjacent to the building on the night of Lucas's injury:

> "In any event, the club certainly knew that the children were running in and out of the building that night. The plaintiff's theory is quite simply that in the dark, Lucas Landry, playing at 10 years old with 8 years [*sic*] old Kerri Hamelin, ran around the corner of that building and ran ahead falling down stairs, that that was occasioned, if by nothing else, certainly by the lack of lighting which has been testified to by a plethora of plaintiff's witnesses although

contradicted also by one of the club members called as an adverse witness in the plaintiff's case.

"All of this, however in the [c]ourt's judgment, adds up to a case where reasonable minds may differ and a case upon which the evidence, if believed, could reasonably satisfy the elements that are necessary to find the defendant negligent, negligent in the maintenance of the premises on that night and in that location. So after completing this analysis, the [c]ourt believes it is compelled as a result of this finding to deny the motion for judgment as a matter of law * * *."

By this point in the trial, numerous witnesses had testified about the lack of any artificial illumination in the area of the stairwell on the night of the wedding reception. Several of plaintiff's witnesses specifically testified that they observed the descending staircase to be dark and unlit on that evening. For example, Jacques Staelen was the person who descended into the stairwell and eventually retrieved the injured Lucas, who he found lying on his side in the dark at the concrete base of the stairs, semiconscious and curled up in the fetal position. He testified that the stairwell was so dark that night that he was unable to locate Lucas on his first trip down the stairs and that he needed to use his cigarette lighter for illumination. Not until his second trip down the stairs was he actually able to perceive the ten-year-old child lying at the bottom of the stairwell.

Another witness for plaintiff, Officer Jackie Davison of the Woonsocket Police Department, testified that he drove to the scene on the morning after the accident to photograph the area where the injury occurred. Officer Davison testified that he observed that the light bulb was missing from the light fixture over the stairwell's door. He also observed, upon closer inspection, that cobwebs were present, both on the empty light fixture and within the socket area. As the trial justice noted, Wayne Grady, an officer of defendant, appeared to contradict this testimony when he stated that he had observed a light bulb in the fixture earlier on the night of the accident.

Because the testimony of these witnesses conflicted on the issue of whether a light bulb was present in the fixture on the night of Lucas's injuries, and, if not, for how long the light bulb had been missing, we hold that the trial justice properly denied defendant's motion for judgment as a matter of law at the close of plaintiff's case-in-chief. The question of whether a light bulb was present in the stairwell area on the night of Lucas's injury and, if so, whether the stairwell light was operating and illuminating the stairwell area, turned on a credibility determination that was properly within the province of the jury; it was not a decision for the trial justice to make. *See Marketing Design Source, Inc.,* 799 A.2d at 271. If the jury concluded that defendant neglected to insert a light bulb in the stairwell's light fixture and failed to ascertain whether the stairwell light was functioning properly on the night in question, then it could find (1) that these circumstances amounted to defendant's maintaining an unsafe and defective artificial condition on the premises, and (2) that defendant should have discovered and corrected it before allowing its premises to be used for hosting a nighttime wedding reception.

Likewise, the same reasoning applies to the trial justice's decision to deny defendant's renewed motion for judgment as a matter of law after the parties had presented the court with all the evidence they sought to introduce. When faced with defendant's renewed motion for judgment at

this juncture, the trial justice again observed:

"With regard to the question of notice [or] lack thereof of a dangerous condition, the testimony of Officer [Davison], without weighing his credibility that he saw no light bulb, he took a picture of it and he saw cobwebs residing in the socket, is directly and diametrically opposed to the testimony of Mr. Grady. There are two apparently reasonable persons where reasonable minds could differ. Do you believe Mr. Grady or do you believe Mr. [Davison]? There [are] enough grounds to deny a motion based on that particular issue."

We agree, and hold that the trial justice properly ascertained that a material issue of fact remained in the case, that its resolution required a credibility determination, and that such a fact-finding exercise was proper for the jury to undertake. Thus, we uphold the trial justice's ruling denying defendant's renewed motion for judgment as a matter of law at the close of the evidence.

## II

### Defendant's Motion for a New Trial

The defendant also challenges the trial justice's ruling denying its motion for a new trial under Rule 59 of the Superior Court Rules of Civil Procedure. In considering a motion for a new trial, the trial justice acts as a "superjuror." *English v. Green*, 787 A.2d 1146, 1149 (R.I. 2001) (quoting *Long v. Atlantic PBS, Inc.*, 681 A.2d 249, 254 (R.I.1996)). This role requires the trial justice to engage in "an independent appraisal of the evidence in light of his [or her] charge to the jury," including "weigh[ing] the evidence and assess[ing] the witnesses' credibility." *Kurczy I*, 713 A.2d at 770 (quoting *State v. Doctor*, 690 A.2d 321, 329 (R.I.1997)). In addition, when considering such a motion,

the trial justice is free to "reject some evidence and draw inferences which are reasonable in view of the testimony and evidence in the record." *Id.* After weighing the evidence in this fashion, the trial justice must decide whether the jury's verdict is an appropriate response to the evidence presented as he or she has evaluated it. *Id.* If so, then the trial justice should deny the motion. *Id.* Likewise,

"If he [or she] determines that the evidence presented an 'evenly balanced-reasonable minds could differ' situation, he [or she] denies the motion. On the other hand, if he [or she] is of the opinion that the verdict is not a proper response to the evidence, he [or she] grants the motion." *Id.*

In reviewing a trial justice's ruling denying a new-trial motion, we accord the trial justice's determination great weight, provided that the "trial justice reviews the evidence, comments on the weight of the evidence and the credibility of the witnesses, and exercises his [or her] independent judgment." *Id.* (quoting *Pantalone v. Advanced Energy Delivery Systems, Inc.*, 694 A.2d 1213, 1216 (R.I. 1997)). When this occurs, the trial justice's ruling on the new-trial motion "will not be disturbed unless he [or she] has overlooked or misconceived material and relevant evidence or was otherwise clearly wrong." *Id.*

Here, defendant argues that the trial justice's denial of its new-trial motion should be overturned because the court's review of the evidence was incomplete and speculative. It also suggests that the trial justice's use of qualifying language in his decision and his failure to specifically discuss every bit of trial evidence rendered it cursory and unworthy of deferential review. We disagree. An examination of the record in this case shows that the trial

justice carefully assessed the evidence presented at trial, commented on the credibility of the witnesses presented, and reached his own independent determination that plaintiff's witnesses were more credible because their testimony had "more of a ring of truth." [1] The trial justice concluded his reasoning as follows:

"So based on all those objective analyses that a jury must make with regard to not only causation but also proximate cause, but for the absence of light might this have happened, but for the absence of the presence of the gate might this have happened, but for adequate supervision provided by the post as possibly mentors of a facility that they know or should have known was going to entertain young children might this accident have occurred?

"There were several theories of liability upon which this jury could find for the plaintiff so the [c]ourt is going to deny the motion for a new trial and note the defendant's exception."

Although the trial justice used qualifying language to describe the different possible theories of liability that the jury could have relied upon in reaching its verdict in favor of plaintiff, his mere use of such qualifying language—or, for that matter, his use of rhetorical questions—did not render his analysis speculative. On the contrary, the trial justice thoroughly analyzed the evidence while functioning in his role as a superjuror. As a result, his decision to deny defendant's motion for a new trial will not be overturned absent this Court concluding that he overlooked or misconceived material and relevant evidence, or that he was otherwise clearly wrong. *See Kurczy I,* 713 A.2d at 770. Our review of the record reveals that this is not such a case; therefore, we lack any grounds to reverse the trial justice's ruling denying defendant's motion for a new trial.

## III

## Evidentiary Rulings

◼ The defendant next challenges several of the trial justice's evidentiary rulings in this case. "It is well established that 'the admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent.' " *DiPetrillo v. Dow Chemical Co.,* 729 A.2d 677, 690 (R.I.1999) (quoting *Bourdon's, Inc. v. Ecin Industries, Inc.,* 704 A.2d 747, 758 (R.I.1997)). The defendant first contends that the trial justice improperly excluded certain opinion testimony proffered by an expert witness for the defense, while erroneously admitting what defendant characterizes as improper opinion testimony from lay witnesses testifying for plaintiff. In addition, defendant suggests that the trial justice erred in admitting rebuttal testimony from a local fire department employee during plaintiff's case-in-chief. Finally, defendant contests the trial justice's ruling admitting into evidence the fact that there were no warning signs present on defendant's building at the time of Lucas's injury, even though the court excluded evidence that defendant added warning signs seven

---

1. In contrast to plaintiff's witnesses, whom he deemed to be credible, the trial justice found "some of the witnesses for the Veterans Association to be hedging, to be not forthcoming and not realistic under all the other facts and circumstances." In addition, he specifically found that Grady's credibility was "pretty much destroyed" in his eyes by the photograph of the light fixture over the stairwell that Officer Davison took on the morning after Lucas's injury, which clearly showed that the bulb was missing from the same fixture that Grady swore provided light for the stairwell on the evening of the wedding.

years later. We discuss each of these arguments in turn.

## A. Expert Witnesses and Opinion Testimony

The defendant argues that the trial justice erred in preventing its expert witness, Dr. John DuVally, M.D., a forensic pathologist, from testifying about the "manner, means and mechanism" of Lucas's fall. At trial, defendant tendered this medical doctor as an expert witness in the field of forensic pathology, indicating that he would offer his opinion about how Lucas arrived at the bottom of the stairwell. When plaintiff objected to the admissibility of this evidence, the trial justice allowed a *voir dire* examination of the expert to evaluate whether the proffered evidence satisfied the requirements of Rule 702 of the Rhode Island Rules of Evidence. In doing so, we hold, he properly exercised his role as an evidentiary gatekeeper, as this Court described that function in *DiPetrillo,* 729 A.2d at 686–87 (relying on the standard for admissibility of expert testimony as first announced by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469, 482 (1993)).

During the *voir dire,* Dr. DuVally testified that, in his expert opinion, the "manner and mechanism" of Lucas's injury was as follows:

"Well, in my opinion, he climbed up on this railing, tried to get up on this railing to look in those windows, his feet went out from under him, he fell, and his abdomen went across this railing here."

After hearing extensive *voir dire* testimony and argument from counsel, the trial justice excluded this portion of the expert's proffered testimony, issuing the following finding in his gatekeeper capacity:

"[T]here is absolutely no testimony, medical history or evidence to support any theory based on this record that the plaintiff did what the doctor suggested that he did do; that he climbed on a railing; that he was tapping on a window; that he lost his balance and fell. This is far beyond the scope of a forensic pathologist in the course of his ordinary and customary dealings with cases of this type. It falls into the area of rank speculation."

On this basis, the trial justice did not allow the expert to testify about the supposed factual sequence that, in the expert's opinion, constituted the "mechanism" of Lucas's injury. The court did, however, allow the expert to testify that Lucas's physical injuries were inconsistent with a fall down the concrete steps.[2]

▮▮▮ Needless to say, "[t]he determination of admissibility of an expert witness's testimony rests within the sound discretion of the trial justice." *Rodriquez v. Kennedy,* 706 A.2d 922, 923 (R.I.1998) (per curiam). A trial justice's ruling on the admissibility of expert testimony will not be overturned by this Court unless we conclude that the ruling constituted an

---

**2.** The trial justice did not permit defendant's expert to testify concerning his opinion that Lucas climbed up on the railing to look in the window, and that his feet then went out from under him, causing his abdomen to strike the railing before he plunged to the bottom of the stairwell. But Lucas's ninth-grade resource teacher later testified that Lucas told him on more than one occasion that his accident occurred when he "fell off a railing." Thus, the record contained sufficient evidence to permit defense counsel to argue to the jury that Lucas's fall resulted from a fall over or "off" a railing rather than down the steps—a theory that would have been consistent with Dr. DuVally's unexcluded testimony about the medical features of Lucas's injuries and how they were, in his opinion, inconsistent with a fall down the stairs.

abuse of discretion. *Gallucci v. Humbyrd*, 709 A.2d 1059, 1064 (R.I.1998); *see also Raimbeault v. Takeuchi Manufacturing (U.S.), Ltd.*, 772 A.2d 1056, 1061 (R.I.2001). Before admitting expert testimony, the trial justice must evaluate whether the testimony that a party seeks to present to the jury is "relevant, within the witness's expertise, and *based on an adequate factual foundation.*" *Rodriquez*, 706 A.2d at 924. (Emphasis added.) Such an evaluation is necessary to ensure that the proffered expert testimony is "relevant, appropriate, and of assistance to the jury," and thus admissible. *DiPetrillo*, 729 A.2d at 686.

Here, the trial justice ruled that Dr. DuVally's proffered testimony concerning the asserted mechanism of Lucas's injuries was "absolutely unsupported by any evidence in this case whether contained in the medical records, depositions or in-court testimony." To be admissible, "an expert's opinion must be predicated upon facts legally sufficient to form a basis for his conclusion." *Raimbeault*, 772 A.2d at 1062 (quoting *Rodriquez*, 706 A.2d at 924).

We agree with the trial justice that, in this case, defendant presented no scientific, medical, or other evidence in Dr. DuVally's *voir dire* that would have established a sufficient factual basis for the expert's proffered opinion that Lucas climbed the railing above the stairwell, balanced on that railing, attempted to reach over the well itself to tap on a window, lost his balance, and then fell on his stomach against the railing before plummeting to the bottom of the stairwell. Although it is true that the expert testified on *voir dire* that Lucas's medical records revealed an abdominal injury—one that he

considered consistent with the type of wound that a fall over or off a railing could cause rather than a fall down stairs—this evidence did not justify allowing the expert to testify about a hypothetical factual sequence that he believed could have led to Lucas's abdominal injury. We note that the trial justice allowed the expert to tell the jury that, in his opinion, Lucas's injuries were inconsistent with tumbling down concrete stairs. The court also allowed Dr. DuVally to outline for the jury the medical evidence that formed the basis for this opinion. Accordingly, we hold that the trial justice did not abuse his discretion in excluding what he deemed to be the speculative portion of Dr. DuVally's proposed expert testimony. Also, given that defendant's counsel would have been able to argue his "over the railing" theory to the jury—and to cite not only to Dr. DuVally's but also to Lucas's ninth-grade teacher's testimony in support of that hypothesis—we fail to see how defendant suffered any prejudice when the trial justice excluded the speculative portion of Dr. DuVally's proffered testimony from the jury.

The defendant also maintains that the trial justice improperly allowed plaintiff to introduce what defendant characterizes as opinion testimony from lay witnesses. Specifically, it objects to testimony that plaintiff introduced through Lucas's sixth-grade teacher concerning her observations of Lucas's physical, behavioral, and educational performance in her classroom during the year of his injury. It also objects to testimony from other unnamed individuals who allegedly testified that they observed Lucas undergo a personality change after the accident.[3]

---

**3.** Despite defendant's filing of a fifty-page legal brief, it devoted only four sentences to its argument about unnamed witnesses testifying to Lucas's personality change. But it failed to

include either references to the trial transcript where these alleged errors occurred, or, for that matter, a specific reference to which witnesses supposedly provided such al-

The defendant characterizes this testimony as improper lay opinion testimony, suggesting that these witnesses, including Lucas's sixth-grade teacher, improperly were allowed to give their lay opinions about Lucas's post-accident behavior despite lacking the expertise to do so. Because these witnesses were not tendered as experts, Rule 701 of the Rhode Island Rules of Evidence governed the admissibility of their testimony. Rule 701 allows lay witnesses to testify to opinions that are both "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

The trial justice allowed the teacher to testify about her own first-hand observations concerning Lucas's physical, behavioral, and educational performance in her classroom after the accident, and then to opine that (1) Lucas's limp seemed "more severe" to her at trial then it had appeared when Lucas was a student in her classroom; (2) Lucas's educational and behavioral performance started strong at the beginning of Lucas's sixth-grade year, only to taper off as time passed in the months after his injury; and (3) as Lucas's sixth-grade teacher, based on his initial performance in her classroom, she would have expected him to pursue education even beyond the high school level. The trial justice admitted this lay opinion testimony,

reasoning that it was relevant to the jury's determination of damages because the jury would have to decide whether Lucas's physical, mental, and behavioral changes after the fall were merely normal "adolescent changes" or whether "as a result of the accident, his own personal self-esteem, value and personal perspective on life was damaged * * *." The trial justice acted within his discretion, we hold, in admitting this evidence because the teacher's statements on these subjects were rationally based on her personal observations of the victim and her experience as a teacher and they would have helped the jury to clearly understand her testimony. Therefore, the trial justice did not err in allowing them into evidence.

## B. Rebuttal Testimony

During her case-in-chief, plaintiff called Grady, one of defendant's officers, as an adverse witness. Grady testified that defendant did not install a gate or any other form of physical barrier over the top of the stairwell because the basement door to the stairwell was a fire exit, and that the local fire department supposedly had instructed the club that no gate would be permitted over the stairwell. Surprised by Grady's testimony concerning the local fire department's alleged refusal to permit a stairwell gate, plaintiff subpoenaed Lt. Joseph Barroso (Lt. Barroso), deputy assistant state fire marshall for the City of Woonsocket,

leged "opinion" testimony. On the contrary, with the exception of Lucas's sixth-grade teacher, defendant merely described the alleged incidents of impermissible lay-opinion testimony as occurring "at various times during the trial." Although defendant unsuccessfully moved to exceed the page limitation on his brief, even its original seventy-five page brief included only the same four sentences addressing this argument, still omitting any transcript or witness references. Thus, at no point has defendant identified where these alleged errors occurred at trial, much less has

it cited to us any legal authorities in support of its argument. "Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." Wilkinson v. State Crime Laboratory Commission, 788 A.2d 1129, 1131 n. 1 (R.I.2002); see also S.Ct. R.App. P. 16(a). As a result, we deem this aspect of defendant's lay-opinion argument waived by reason of inadequate briefing, and do not address it specifically on appeal.

as a rebuttal witness.[4] After Grady's testimony concluded, and still during the course of plaintiff's case-in-chief, plaintiff asked the trial justice to allow Lt. Barroso to testify out of turn to rebut what Grady had said about the local fire authority's refusing to allow the installation of a gate at the top of the stairwell. The defendant objected, arguing that it was improper for plaintiff to call a previously undisclosed rebuttal witness during its case-in-chief. Nevertheless, the trial justice allowed Lt. Barroso to testify during the course of plaintiff's case-in-chief "for the purposes of rebuttal only." Lieutenant Barroso then testified, over defendant's objection, that it would have been permissible for the club to install a gate over the top of the stairwell, provided that it "could not be locked" and that it would "swing with the path of egress."

On appeal, defendant argues that the trial justice erred in allowing plaintiff to call Lt. Barroso *during its case-in-chief.* Specifically, defendant insists that plaintiff could not have been surprised by Grady's testimony because plaintiff had deposed him previously on three different occasions over the course of this litigation. The defendant argues that plaintiff should not be permitted to call a "planned, undisclosed expert" under the guise of a rebuttal witness. The plaintiff counters that Lt. Barroso was a legitimate rebuttal witness, called only to counter Grady's testimony about a previously undisclosed communication from the local fire department with respect to the asserted impermissibility of a gate over the stairwell.

"The admission of competent rebuttal evidence lies within the discretion of the trial justice." *Labree v. Major,* 111 R.I. 657, 675, 306 A.2d 808, 819 (1973).

We have discussed the proper admission of rebuttal testimony as follows:

"[A] plaintiff who has the burden of proof on an issue cannot hold back his evidence but must give all of his evidence supporting the affirmative of the issue when presenting his case-in-chief. However, a plaintiff is not bound to anticipate a defense. Thus, in rebuttal he is entitled to answer new matter introduced by the defendant." *Id.*

Here, Grady, an officer of the defendant corporation, suggested for the first time while he was testifying as an adverse witness that the local fire department would not permit defendant to install a gate or other structure blocking egress at the top of the stairwell. This fact was not disclosed during any of Grady's pretrial depositions or through any other discovery response. As a result, the trial justice allowed plaintiff to rebut this evidence by calling an additional witness. Although rebuttal witnesses usually should not testify until after both sides have finished presenting their evidence and the defendant has rested its case, the order of the witnesses at trial is a matter left to the trial justice's sound discretion. *See State v. Earley,* 118 R.I. 205, 210, 373 A.2d 162, 165 (1977) ("The order of proof rests within the sound discretion of the trial justice."). Thus, it was within the discretion of the trial justice in this case to allow plaintiff to call this witness out of turn during plaintiff's case-in-chief for the purpose of rebutting Grady's testimony. *Id.* Also, allowing rebuttal testimony at this point of the trial did not prejudice defendant. On the contrary, presenting Lt. Barroso's testimony as a part of plaintiff's case-in-chief gave defendant the opportunity to respond more fully or to counter

4. The plaintiff averred, both at trial and on appeal, that defendant had not disclosed previously during discovery its alleged inability to install a gate, and that, as a result, Grady's testimony at trial on this subject came as a surprise to plaintiff.

this testimony when presenting its own case. Accordingly, we uphold the trial justice's ruling allowing Lt. Barroso to testify during the plaintiff's case-in-chief as a rebuttal witness.

## C. Evidence Concerning the Absence of Warning Signs

The defendant next argues that it was error for the trial justice to admit evidence concerning the lack of any warning signs with respect to the open stairwell at the time of Lucas's injury. To support this argument, defendant notes that the trial justice excluded evidence that defendants later installed warning signs on the property as evidence of a subsequent remedial measure. The trial justice ruled that plaintiff's evidence that defendant installed warning signs on the subject property approximately seven years after Lucas's injury was not sufficiently close in time to satisfy the requirements of Rule 407 of the Rhode Island Rules of Evidence as an admissible subsequent remedial measure.[5] The defendant argues that in light of this ruling barring evidence of a subsequent remedial measure, it was error for the court to allow plaintiff to inquire into the absence of warning signs on the night in question. The defendant also contends that this evidence was improperly admitted because plaintiff offered no evidence that the presence of warning signs would have prevented Lucas's injuries.

■■■ The presence or absence of warning signs on the night of Lucas's injury was unrelated to the trial justice's ruling about defendant's subsequent remedial measures. As defendant notes, the trial justice excluded evidence that defendant later had installed warning signs on the

club's premises, ruling that signs installed seven years after the incident did not satisfy the requirements of Rule 407. We agree with the trial justice, however, that this evidentiary ruling did not preclude plaintiff from questioning witnesses and eliciting testimony about the absence of warning signs on the night in question. The presence or absence of warning signs on the night of Lucas's injury was relevant to the jury's factual determination about whether a dangerous condition existed on defendant's premises, whether the club was aware of this alleged defective condition, and whether it took reasonable precautions to guard against any such dangerous condition on the property. Moreover, given that, during the trial, at defendant's request, the jury took a view of the premises on which warning signs were plainly visible, and given the introduction of certain photographs into evidence showing the post-accident presence of warning signs on the property, such evidence was admissible to correct a possible misimpression in the jurors' minds that these signs also were present on the date of Lucas' injury. Thus, we agree with the trial justice that evidence concerning the absence of warning signs on the night in question posed a separate evidentiary issue from plaintiff's attempt to show that defendant later installed warning signs as a subsequent remedial measure. As a result, we uphold the trial justice's admission of testimony about the absence of warning signs on the night of May 19, 1990.

## IV

### Jury Instructions

■■■ The defendant next argues that several of the trial justice's jury in-

---

5. Rule 407 of the Rhode Island Rules of Evidence provides:

"**Subsequent remedial measures.**—When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is admissible."

structions were erroneous. When reviewing challenged jury instructions, we consider the charge "in its entirety, 'in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give [to the instructions].' " *Patino v. Suchnik,* 770 A.2d 861, 866 (R.I. 2001) (quoting *Neri v. Nationwide Mutual Fire Insurance Co.,* 719 A.2d 1150, 1153 (R.I.1998)). We will reverse an erroneous jury instruction "only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." *Id.* (quoting *Brodeur v. Desrosiers,* 505 A.2d 418, 422 (R.I.1986)). *See also Saber v. Dan Angelone Chevrolet, Inc.,* 811 A.2d 644, 653 (R.I.2002).

■ One of defendant's challenges to the jury instructions concerns the trial justice's original charge to the jury that it could consider Lucas's lost-earning capacity when determining damages. Because plaintiff had waived any right to recover on this basis at an earlier hearing, lost-earning capacity was, as both parties stipulated before the trial justice, no longer an issue in the case when the trial justice instructed the jury on this subject. Upon realizing his error, however, the trial justice immediately corrected his charge by issuing a curative instruction to the jury. We are of the opinion that this curative instruction mitigated the error that resulted from the first instruction, rendering the erroneous instruction harmless. Thus, defendant *suffered no prejudice* as a result of this instruction, and we deny his appeal in this respect. We now turn to defendant's remaining challenges to the trial justice's jury instructions.

### A. Duty of Care

■ The defendant contends that the trial justice erroneously instructed the jury concerning the duty of care that defendant owed to the injured Lucas in his capacity as an invited wedding guest on the premises that defendant owned and allowed another party to use for the purpose of holding a wedding reception. In its brief, defendant asserts that the trial justice instructed the jury that defendant, as a landowner, owed a higher duty of care to children. Such an instruction, defendant argues, was contrary to this Court's precedents holding that landowners owe a duty of reasonable care to all invitees reasonably expected to be on their premises, including children. *See Kurczy I,* 713 A.2d at 772 n. 6; *Brennan v. New England Grocers Supply Co.,* 112 R.I. 781, 785, 316 A.2d 344, 346 (1974) (holding that landowners owed a minor plaintiff "a duty to use reasonable care to keep its premises in a safe condition for the purpose of the invitation extended"). After a careful review of the record, however, and after considering the trial justice's charge in its entirety, we are not persuaded that the trial justice so instructed the jury, or that the instructions he gave were erroneous. After instructing the jury that a landowner had "a duty to exercise reasonable care for the safety of individuals reasonably expected to be on its premises," the trial justice went on to instruct the jury as follows:

> "In this case, you may consider whether or not the landowner owed a greater degree of care to this plaintiff because said plaintiff was a minor and whether or not the defendant was required to exercise a greater degree of care to maintain its premises in a reasonably safe condition for the purposes intended by the plaintiff's visit on the defendant's premises."

Thus, after instructing the jury that defendant owed a duty of reasonable care to those persons, such as the wedding guests, whom it expected to be present on its premises, the trial justice gave the jury further instructions, advising that it could

determine whether the landowner (defendant) owed a greater degree of care to plaintiff because Lucas was a minor and because children such as Lucas would be included among the invited guests. Although the trial justice should not have insinuated that the jury could determine whether the landowner owed a duty involving "a greater degree of care" than reasonable care because of Lucas's status as a minor, we deem this part of the instruction to be harmless error in light of the additional instruction that followed. The trial justice immediately thereafter informed the jury that, in evaluating what constitutes reasonable care, it could consider whether defendant was obliged to exercise a greater degree of care to maintain its premises in a reasonably safe condition for "the purposes intended by [Lucas's] visit on the defendant's premises."

In *Haddad v. First National Stores, Inc.,* 109 R.I. 59, 280 A.2d 93 (1971), this Court discussed a landowner's duty of reasonable care as applied to trespassing children, adopting the "attractive nuisance doctrine" as described in the Restatement (Second) *Torts* § 339 at 197 (1965). In doing so, we stated:

"A young child cannot, because of his immaturity and lack of judgment, be deemed to be able to perceive all the dangers he might encounter * * * on the land of others. There must and should be an accommodation between the landowner's unrestricted right to use of his land and society's interest in the protection of the life and limb of its young. When these respective social-economic interests are placed on the scale, the public's concern for a youth's safety far outweighs the owner's desire to utilize his land as he sees fit.

"In adopting the Restatement rule, we emphasize that the possessor of land is not the insurer of the safety of the

young * * *. When, however, he knows or should know that children are likely to [be present] upon a part of the property on which he maintains an artificial condition which is likely to be dangerous to them, he may be liable for the harm resulting to them." *Haddad,* 109 R.I. at 64, 280 A.2d at 96.

When, as here, a landowner knows not only that children are likely to be present on his or her property, but also that such children will be present on the property as invited guests, the landowner's obligation to maintain the property in a reasonably safe condition for the purposes of the invitation extended cannot be less than that owed to trespassing children under the same circumstances. *See, e.g., Tantimonico v. Allendale Mutual Insurance Co.,* 637 A.2d 1056, 1059–60 (R.I.1994).

In this case, defendant had "booked" the upstairs portion of its premises to a third party on the night of May 19, 1990, for the purpose of holding a wedding reception. It was certainly foreseeable that a number of children would attend such an event, and that these children would be present both inside and outside defendant's premises during the course of the evening. Under such circumstances, the jury could properly consider Lucas's status as a minor, the purpose for his presence there, and his status as an invited guest on defendant's premises in evaluating whether defendant exercised the higher degree of reasonable care that might be required to maintain its premises, including any artificial conditions thereon, in a reasonably safe condition for children on the night in question. As a result, we hold, the trial justice's charge to the jury on these issues, when considered in its entirety, did not constitute reversible error.

## B. Spoliation

 The defendant also suggests that the trial justice erred in charging the jury

on spoliation of evidence, arguing that it was both inappropriate under the circumstances of this case and a misstatement of the law. We have held that "the deliberate or negligent destruction of relevant evidence by a party to litigation may give rise to an inference that the destroyed evidence was unfavorable to that party." *Tancrelle*, 756 A.2d at 748. Thus, a showing of bad faith on the part of the so-called despoiler is not required before the fact finder will be permitted to draw this inference, although "a showing that a party has destroyed evidence in bad faith or in anticipation of trial may strengthen the spoliation inference." *Rhode Island Hospital Trust National Bank v. Eastern General Contractors, Inc.*, 674 A.2d 1227, 1234 (R.I. 1996).

During discovery, plaintiff sought the production of defendant's board-meeting minutes for certain meetings before and after Lucas' injury at which the board may have discussed the wedding or the accident. The defendant failed to produce these minutes, despite the fact that Grady testified how the minutes were normally kept in the regular course of the club's business and that the board definitely discussed the accident at several of its meetings. Nevertheless, after a diligent search, he was unable to locate certain minutes that were responsive to plaintiff's request. In light of this testimony, the trial justice instructed the jury on spoliation, as follows:

"Now, during this trial, you have heard some testimony that one of the parties has been unable to provide evidence that was requested in the ordinary course of discovery for a trial of this nature. Now, when evidence is made unavailable, it may be called spoliation of this evidence. Under certain circumstances, spoliation of evidence may give rise to an adverse inference that the missing or spoliated evidence would have been unfavorable to the position of the party who was unable to produce it. Spoliation of evidence may be innocent or intentional or it may be somewhere in between. It is the unexplained and deliberate absence of relevant evidence that gives rise to an inference that the evidence missing would have been unfavorable to the position of the spoliator."

The judge continued his instruction, telling the jurors that, if they determined that the missing evidence was due to defendant's carelessness, they might consider whether this "carelessness or negligence was so gross as to amount to a deliberate act, or as we call it spoliation or, in reviewing the whole issue, you may consider that it is no big deal, that it was not important, that it had no bearing on this case." The defendant objected to these instructions, arguing that they were improper because there was no evidence that the unproduced evidence in this case was either relevant or deliberately destroyed, and therefore the evidentiary standard for a spoliation instruction had not been established. *See Tancrelle*, 756 A.2d at 748. The defendant also argues that the trial justice misstated the law by instructing the jury that spoliation "may be innocent or intentional or it may be somewhere in between," arguing that spoliation requires either the intentional or negligent destruction of evidence.

We have held that an adverse inference from spoliated evidence "ordinarily would arise where the act was intentional or intended to suppress the truth, but 'does not arise where the destruction was a matter of routine with no fraudulent intent.' " *State v. Barnes*, 777 A.2d 140, 145 (R.I. 2001) (quoting 29 Am.Jur.2d *Evidence* § 244 at 256 (1994)). It is true that no evidence was adduced at trial that the minutes in question were destroyed—ei-

ther intentionally or otherwise—and yet it was the practice of the association to retain copies of their board-meeting minutes for the period in question. Thus, the unavailable minutes would not usually have been destroyed as a part of the club's routine practice. The fact that the minutes in question were not routinely destroyed by the corporation does not change the fact that they could not be located or produced by the defense—despite the fact that defendant usually would retain such records in the ordinary course of its business. The defendant essentially argues that a spoliation instruction was inappropriate because plaintiff could not prove that the unavailable evidence in question was in fact destroyed by defendant in anticipation of trial. We decline to place such a burden on the party seeking to introduce such relevant evidence. We also decline to allow defendant to benefit from its own unexplained failure to preserve and produce responsive and relevant information during discovery. As a result, we hold, it was appropriate for the trial justice to give a spoliation instruction under these circumstances.

■ We now turn to the language of the jury instruction itself. As we have previously observed, "[d]estruction of potentially relevant evidence obviously occurs along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality." *Rhode Island Hospital Trust National Bank,* 674 A.2d at 1234 (quoting *Welsh v. United States,* 844 F.2d 1239, 1246 (6th Cir.1988)). Here, the trial justice properly instructed the jury that it must first find that defendant either deliberately or negligently caused the board-meeting minutes to be unavailable before it decided whether to draw an adverse inference that the missing evidence could have been unfavorable to defendant. He did not instruct the jury

that innocent spoliation of relevant evidence would warrant such an inference. Thus, considering the evidence that defendant discussed the accident at one or more of the board meetings, and reviewing the justice's spoliation instruction in its entirety, we do not consider it to be a misstatement of the law. Therefore, we hold, the trial justice's instruction on spoliation did not constitute reversible error.

### C. Absence of a Gate and of Warning Signs

■ The defendant also challenges the court's jury instructions concerning the absence of a gate and warning signs on defendant's premises. The defendant argues that it was error for the trial justice to instruct the jury that the absence of a gate and of warning signs concerning the stairwell could be considered evidence of negligence, pointing out that no statute or code provision required defendant to install or maintain these safety features on its premises. We agree with defendant that it would have been erroneous for the trial justice to charge the jury that defendant's failure to maintain a gate or warning signs on its property constituted evidence of negligence *per se. Cf. Salcone v. Bottomley,* 85 R.I. 264, 267, 129 A.2d 635, 637 (1957) ("There is no question that the violation of a statute or an ordinance is not negligence *per se* but is to be used by the trier of the facts merely as an aid in determining that issue on consideration of all the evidence."). But the trial justice did not instruct the jury that defendant's failure to install or maintain these safety features on its property was evidence of negligence *per se.* Instead, the trial justice properly instructed the jury that it could consider the absence of a gate, adequate lighting, and warning signs on the premises that night, if it found those facts to be proven at trial, in determining whether defendant "was, in fact, negli-

gent." In so charging the jurors, the trial justice informed them that they could consider whether defendant's failure to have these safety devices on its premises constituted or rose to the level of negligence, given the potentially dangerous artificial condition that an open, darkened stairwell posed to children who were attending a nighttime social event. Whether defendant exercised reasonable care in maintaining its premises that night was a question properly put to the jury, and defendant's failure to install or to maintain certain safety features on the property was one factor that the jury could properly consider in making this determination. As a result, we hold, these instructions were not erroneous.

### D. The Supplemental *Allen* Charge

■ Finally, defendant raises several points of error on appeal about the trial justice's two supplemental or *Allen* charges, an eponymous type of jury instruction derived from the United States Supreme Court's holding in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).[6] At the end of the day on Friday, December 3, 1999, after the jury had been deliberating for approximately a day and a half, the foreman sent a note to the trial justice informing him that the jurors were unable to reach a

unanimous verdict on the issue of liability. At that point, the trial justice called the jurors into the courtroom and instructed them that he was releasing them for the weekend, but that he would ask them to return on Monday to reexamine the case with a fresh approach. At the same time, the trial justice instructed the jurors to respect each other's opinions and asked them not to abandon any firmly held convictions they might have about the evidence in the case. Before dismissing the jurors on Friday afternoon, however, the trial justice informed them that even though he would ask them "to take a fresh look at this case" on Monday, if the jury was "in fact dead-locked" after trying again to come to a unanimous decision, he would accept the impasse and declare a mistrial. The defendant did not offer a timely objection to this first *Allen* charge on Friday afternoon,[7] and thus it failed to preserve any objection thereto for our consideration on appeal.

On the following Monday morning, the trial justice delivered a long *Allen* charge to the jurors before returning them to continue their deliberations. The defendant challenges this charge in several respects, arguing that the trial justice's supplemental instruction was overly coercive, and thus constituted error. First, defen-

---

**6.** Although the *Allen* charge derives its name from this case, the language of the charge approved in *Allen v. United States* actually was taken from a supplemental charge upheld by the Massachusetts Supreme Judicial Court in *Commonwealth v. Tuey*, 62 Mass. (8 Cush.) 1, 3 (1851). *See Allen v. United States*, 164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528, 531 (1896). In this case, the trial justice quoted and adapted from the *Tuey* charge in his second supplemental charge to the jury. For the full text of the *Tuey* charge, *see* 62 Mass. (8 Cush.) at 2–3; *see also* Note, *Due Process, Judicial Economy and the Hung Jury: A Reexamination of the Allen Charge*, 53 Va. L.Rev. 123, 123 n. 5 (1967).

**7.** Indeed, the transcript reflects not only that defense counsel offered no objection to the trial justice's *Allen* charge on Friday afternoon, but also that he lavishly complimented the trial justice for giving this instruction, saying:

"I think that you handled it very, very well, the way that you said it to them in a very, very nice way, * * * and I think, as you indicated, that you are going to give them the same kind of nice approach on Monday * * * it will give them a fresh approach, and we'll go from there."

dant avers that the trial justice's charge was overly coercive to those in the minority on the jury, arguing that the court improperly instructed such jurors to reexamine their positions in light of the majority view, but not vice versa. Second, defendant argues that the trial justice improperly urged the jury to resolve any personality differences that might exist among the jurors, and employed what defendant characterizes as "mandatory language" about the jury's duty to deliberate and reach a verdict in the case. The defendant suggests that these statements improperly coerced the jurors to get along with each other and to return a verdict at all events, and that the court did not emphasize the necessity for the jurors to maintain any firmly held convictions they might have about the evidence. Third, defendant argues, the trial justice improperly referred to the rarity of hung juries. It especially cites as a point of error the justice's comment that no jury could do a better job than this one in deciding this case. Finally, defendant argues that the trial justice erred by over-emphasizing the time and expense invested by the parties in the trial. Essentially, defendant contends that the trial justice's instruction, taken as a whole, was unduly coercive, and thus constituted error.[8]

▆▆▆▆ In reviewing an *Allen*-type charge to a deadlocked jury, we consider the charge "in its context and under all the circumstances." *Lowenfield v. Phelps*, 484 U.S. 231, 237, 108 S.Ct. 546, 550, 98 L.Ed.2d 568, 576–77 (1988) (quoting *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957, 958 (1965) (per curiam)). In addition, we have held that, rather than developing *per se* rules, "[e]very *Allen* charge situation must be decided upon the particular facts and circumstances of the individual situation." *State v. Souza*, 425 A.2d 893, 900 (R.I. 1981) (quoting *United States v. Taylor*, 513 F.2d 70, 72 (5th Cir.1975)). Although *Allen* charges historically have arisen more frequently in a criminal context, we approved their use in a civil case as well. *See Bookbinder v. Rotondo*, 109 R.I. 346, 352–54, 285 A.2d 387, 390–91 (1972) (upholding the use of an *Allen* charge in a civil case). In determining whether a trial justice's supplemental instructions are impermissibly coercive, "the propriety of his [or her] remarks addressed to a jury after retirement must be measured by the ordinary meaning of the language employed in the light of the surrounding circumstances and the subject matter under discussion." *Id.* at 353, 285 A.2d at 391 (quoting *Smith v. Campbell*, 82 R.I. 204, 206, 107 A.2d 338, 339–40 (1954)).

In the many years since the United States Supreme Court in *Allen* originally

---

8. The defendant also argued on appeal that the trial justice impermissibly attached a "lunch deadline" to the jury's deliberations. The defendant did not offer a timely objection to this specific portion of the trial justice's supplemental charge, however, as required by Rule 51(b) of the Superior Court Rules of Civil Procedure. *See* text, *infra*. We also note that defendant's general objection to the language of the trial justice's Monday morning *Allen* charge was insufficient to preserve for appellate consideration points of error that it failed to bring to the attention of the trial justice by specific objection. *See Tinney v. Tinney*, 770 A.2d 420, 433 (R.I.2001) (holding that a general objection at trial is insufficient to preserve specific grounds for an appeal not asserted before the trial justice). As a result, we deem its "lunch deadline" argument waived on appeal, and do not consider it. We do note in passing, however, that this Court held that the imposition of a "deadline" in a supplemental jury instruction does not, in and of itself, constitute improper coercion on the part of the trial justice. *See State v. Souza*, 425 A.2d 893, 900–01 (R.I.1981) (upholding the imposition of a deadline on jury determinations when the charge, considered as a whole in light of the factual circumstances surrounding it, was not coercive).

approved of the use of a supplemental jury charge in response to deadlocked juries, discussion has continued in certain legal circles over the propriety of using an *Allen* charge. As we noted in *Souza*, the heart of this discussion has focused on the original *Allen* charge's language instructing jurors in the minority to reexamine their conclusions in light of the majority's position—but not giving the same admonishment to jurors in the majority. *See Souza*, 425 A.2d at 899; *see also* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure:* Civil 2d § 2556 at 449–51 (1995). In essence, critics of the charge argue that such language is unduly coercive to minority-view jurors, instructing them to abandon their positions in favor of the majority's position. *See United States v. McElhiney*, 275 F.3d 928, 937–38 (10th Cir.2001) (providing a recent overview of the ongoing *Allen* charge controversy). This debate caused many jurisdictions, including Rhode Island, to recommend the use of a modified *Allen* charge that refrains from singling out the minority jurors. *See Souza*, 425 A.2d at 899 (suggesting "that consideration be given to compliance with § 5.4(a) and (b) of the ABA Standards," now renumbered as Standard 15–4.4 in the American Bar Association Standards for Criminal Justice (2d ed.1980), in delivering supplemental jury instructions). After our decision in *Souza*, however, the United States Supreme Court revisited the *Allen* charge issue in *Lowenfield*, and again approved such language upholding the validity of *Allen*'s minority-focused charge:

> "[T]he *Allen* charge urged the minority to consider the views of the majority, and ask themselves whether their own views were reasonable under the circumstances. [The United States Supreme] Court upheld the conviction and sentence against the defendant's claim of coercion [in *Allen* ], saying:

>> 'The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at the moment; or, that he should close his ears to the arguments of men [or women] who are equally honest and intelligent as himself [or herself].' [*Allen*, 164 U.S. at 501–02, 17 S.Ct. at 157, 41 L.Ed. at 531.]

> The continuing validity of [the United States Supreme] Court's observations in *Allen* are beyond dispute * * *." *Lowenfield*, 484 U.S. at 237, 108 S.Ct. at 550–51, 98 L.Ed.2d at 577.

■ Although the debate over the coerciveness of the traditional *Allen* charge continues in the criminal context, "[t]he noisy controversy that has arisen about the use of the charge upheld in *Allen v. United States* in criminal cases has not reached the civil side of the docket." 9A Wright & Miller, § 2556 at 449–50. Nevertheless, "in civil cases as much as criminal cases, it is error for the judge to instruct the jury in a coercive manner." *Id.* at 450–51. But, as one commentator has observed, and as the United States Supreme Court reaffirmed in *Lowenfield*, the mere direction of a supplemental charge at minority jurors is not, in itself, coercion—provided that jurors are still instructed to retain any firmly held convictions that they may have about the evidence:

"As originally formulated, the *Allen* charge involved the delicate balancing of the explicit suggestion that the minority reconsider its position with the broad instruction that no juror ignore his convictions. * * * [I]nstructing the jury not to surrender conscientiously held convictions, is said to supply the balance essential to offset that part of the charge directed at urging the dissenters to doubt the reasonableness of a view not shared by the majority. It has been held reversible error to admonish the minority to reexamine its opinion without including the so-called balancing instruction making it equally clear that the verdict must represent the final judgment of each juror and not mere acquiescence in a majority view of which he remains unconvinced." Comment, *The Allen Charge: Recurring Problems and Recent Developments*, 47 N.Y.U. L.Rev. 296, 302 (1972).

This Court engaged in similar analysis of this issue on more than one occasion. *See Bookbinder*, 109 R.I. at 354, 285 A.2d at 391–92 (holding that a similar instruction directed only at minority-view jurors was not coercive when the charge also "contain[ed] a statement that a verdict must be a juror's own verdict, the result of his own convictions, and not mere acquiescence in the opinion of others"); *see also State v. Vega*, 789 A.2d 896, 898 (R.I.2002) (per curiam) (holding that an *Allen* charge was not coercive when it included language instructing "the jurors that they should not abandon any positions conscientiously held").

■ Here, defendant's first point of error concerning the trial justice's supplemental charge is that the justice improperly instructed the minority jurors to reevaluate their positions in light of the majority view without including a similar instruction that majority jurors also re-evaluate their positions. In this case, the trial justice delivered a traditional *Allen* charge, quoting and adapting from the language of the original charge approved of by the United States Supreme Court in *Allen. See* note 6, *supra.* As such, the trial justice instructed the jury:

" 'In conferring together, you ought to pay proper respect to each other's opinions and listen with a disposition to be convinced of each other's arguments. If the larger number of your panel are for one side or the other, the dissenting juror or jurors should consider whether doubts in that juror's mind as to the products of their conclusion, that is, the conclusion of the majority, if there is a majority, are reasonable. In view of the fact that the doubts which you have, that is, the person who holds a minority view or those who may hold a minority view has made no impression on the minds of the other men and women who are equally honest and equally intelligent as you are yourself and have heard the same evidence and given the same attention as you have in this case and with the same equal desire to arrive at the truth under the provisions of the oath that you took as jurors.'

" * * *

"So I want to appeal to your fairness and to the desire which I'm sure is in every one of you to want to do your duty to approach the consideration in this case in the spirit of the judge's appeal of many years ago that I have just read to you, and I am going to ask the minority, if there is a minority, to listen to the others and exchange views and arguments in an honest effort to come to a decision in this case.

" * * *

"[W]e are asking you and imploring you not to give up any firmly held convictions that you may have but honestly

assess the position in the light of the positions of others to see whether or not your mind can be reasonably amenable to being convinced that perhaps the position that you held was not correct[.][I]f after going through this analysis * * * your mind [may be] left in the same condition as it may have been before we started this. But give it an honest effort and if you have done your best, we will let you go."

Here, the trial justice properly qualified his instructions to minority-view jurors with a clear charge instructing all jurors not to give up any firmly held convictions they might have about the evidence presented. Such a charge is consistent with the United States Supreme Court decision in *Lowenfield*, 484 U.S. at 237–38, 108 S.Ct. at 550–51, 98 L.Ed.2d at 577, and it is also consistent with the previous decisions of this Court. *See Vega*, 789 A.2d at 897; *Souza*, 425 A.2d at 900; *Bookbinder*, 109 R.I. at 354, 285 A.2d at 391–92. As a result, we hold, the trial justice's charge, taken as a whole, was not unduly coercive to minority-view holders on the jury.

■ The defendant next argues that the trial justice improperly admonished the jurors to put aside their personal differences, employing "mandatory language" that, according to defendant, could have coerced the jurors into believing that they must return a verdict under any and all circumstances. The particular portion of the trial justice's charge that defendant challenges is as follows:

"What that [the quoted and adapted language from *Tuey* ] really means is whether you like each other or not, and I don't know if that is the situation or not, or whether you have reached some personality differences in your three weeks together, which unfortunately is unknown, but I'm speculating here, I'm asking you to put aside those differences.

"You took an oath to listen to the facts in this case.

" * * *

"When you were first brought in here, you were told what would be expected. You were asked whether you could fairly and impartially listen to all the testimony that would be presented, and you swore that you would and you took your oath. To the same, you also swore that you would honestly consider everything that was presented here and give it an honest decision regardless of any partiality or other outside interest, and I am going to appeal to you to go back to the jury room to be able to listen to each other and try to come to a decision."

The defendant argues that these instructions were improper, because they amounted to sending the jurors on a "guilt-trip" because of their inability to return a verdict. The defendant contends that the trial justice did not properly emphasize that the jury had a "right to hang" if the jurors could not reconcile their conscientiously held beliefs about the evidence. In this regard, one commentator has provided an interesting insight into a judge's role when instructing a deadlocked jury:

"The judge's role in this situation can only be that of a catalyst. His words, though the same whatever the situation of the jury, should be chosen so their effect on differently situated juries will be different. Properly hung juries will feel no effect; improperly hung ones will move toward unity. Three types of instructions have some chance of performing this catalytic function: urging respect for others' opinions, urging active deliberation, and urging jurors to defend their position." Note, *On Instructing Deadlocked Juries*, 78 Yale L.J. 100, 133–34 (1968).

Here, taking the trial justice's instruction as a whole, we are convinced that, in instructing the jurors to put aside any differences they might have, he was merely charging them to respect the opinions of the other jurors. As both the United States Supreme Court and various commentators have observed, it is proper for a trial justice to instruct jurors in an *Allen* charge to "examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; [and] that they should listen, with a disposition to be convinced, to each other's arguments." *See Allen*, 164 U.S. at 501, 17 S.Ct. at 157, 41 L.Ed. at 531; *see also* 78 Yale L.J. at 134–35 (concluding that "[s]uch instructions are clearly correct" because they encourage jurors to respect each other's opinions, to actively participate in jury-room discussions, and "may accomplish some good if the jury is divided by anger or by the refusal of some jurors to participate").[9] Furthermore, the trial justice's admonition about the jurors' oath to decide the case cannot be viewed as coercive, especially in light of the comments the trial justice made while concluding his *Allen* charge, directly before returning the jury to its deliberations:

"Be reasonable and civil to the understanding of each others' position and, keep in mind, that this case is a case that needs to be decided. If you can reach unanimity, that will be great. If you can't, you're doing so in an honest and forthright manner, that is fine, too. We can't ask any more of you than that, and we assume that is what you're doing."[10]

Taking the trial justice's charge as a whole, he explained to the jurors that they could retain any conscientiously held opinions that they might have about the evidence, and that, although they should attempt to reach a verdict, they were not to do so at the expense of any firmly held convictions. We therefore hold that the trial justice's *Allen* charge was not coercive in this respect.

The defendant also raises as points of error on appeal the trial justice's comments concerning the rarity of hung juries, that no future jury could better decide the case, and that the parties possessed an economic stake in the outcome of this trial. The defendant argues that these statements were improperly coercive to the jury. The trial justice charged the jury as follows, quoting again in part from the *Tuey* charge approved by the United States Supreme Court in *Allen:*

9. The defendant has argued that the trial justice's admonitions, taken as a whole, amount to "mandatory language" pressing the jurors to arrive at a verdict, in violation of the United States Supreme Court's holding in *Jenkins*. *See Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957, 958 (1965) (per curiam) (holding a federal trial court's supplemental instruction, "[y]ou have got to reach a decision in this case[,]" given after only two hours of deliberation, constituted error). Because *Jenkins* was not decided on constitutional grounds, but rather under the United States Supreme Court's supervisory powers over the federal courts, *Jenkins* has recently been held inapplicable to state-court proceedings. *See Early v. Packer,* —— U.S. ——, ——, 123 S.Ct. 362, 366, 154 L.Ed.2d 263, 271 (2002) (per curiam). Even on the merits of this issue, however, we are of the opinion that the trial justice's supplemental admonitions, taken as a whole and considering all the circumstances, did not constitute mandatory language compelling the jury to return a verdict. *See* text, *infra*.

10. This Court has upheld similar supplemental instructions reminding jurors of their oath and duty to consider the evidence impartially. *See State v. Rogers*, 420 A.2d 1363, 1367–68 (R.I.1980).

"I think you understand and realize that some jury at some time has got to decide this question, and if it is not this jury, it will have to be another one. If the trial results in disagreement, another trial will have to ensue with a consequent loss of time and money to all of the participants in this case, over 30 witnesses that you heard before this court and all of the other attendant costs which you can imagine are quite considerable in putting on a case of this nature.

"Now, I have been watching your attendance of this case over the last three weeks, and I cannot imagine that there is any other jury that we could select to whom a more complete story could be told or who could be able to understand or be more intelligent to follow the testimony in this case and come to an honest, just conclusion than you six who have been listening to this case for the past two and-a-half weeks.

" * * *

" 'You should consider that you are selected in the same manner and from the same source from which any further jury might be selected and there is no reason to suppose that the case might be submitted to a jury of six more competent to decide it than you are or that the evidence presented in this case, if it has to be retried, will be produced any clearer by one side or the other, and with this point in view, it's your duty to decide this case if you [can] conscientiously do so.' "

In previous cases, we have upheld supplemental jury instructions that, like the instruction quoted above, have informed the jurors that hung juries are uncommon and that have emphasized the notion that no other group of potential future jurors could be considered more qualified to hear the case than the present jurors. *State v. Patriarca*, 112 R.I. 14, 51, 308 A.2d 300, 321–22 (1973); *see also Vega*, 789 A.2d at 898. In addition, we also have upheld *Allen* charges that include references to economic factors, provided that these instructions fairly reference the expenses incurred by both parties. *See Vega*, 789 A.2d at 898; *Patriarca*, 112 R.I. at 51, 308 A.2d at 321–22; *Bookbinder*, 109 R.I. at 353, 285 A.2d at 391. In *Vega*, we held that, although the trial justice committed error by instructing the jury that the case necessarily would have to be retried in the event of a mistrial, this error did not require reversal because, "taken as a whole, the supplemental instructions were not unduly coercive or unfair to the defense." *Vega*, 789 A.2d at 898. In so holding, we noted that the trial justice properly balanced his instruction—charging the jurors not to abandon any firmly held convictions they might have about the evidence—by informing them that he would keep them no longer than necessary if they were hopelessly deadlocked, and by talking about the expense of any retrial to both parties. *Id.*

Here, we are faced with a similar supplemental jury instruction, one in which the trial justice also erroneously instructed the jury that a mistrial would necessitate a new trial.[11] He later acknowledged, however, that this potential consequence of the jury's inability to reach a verdict was only a possibility when he said "if [the case] has to be retired." Nevertheless, as was the case in *Vega*, the trial justice's charge, when taken as a whole, was not unduly

11. After all, as we noted in *State v. Vega*, 789 A.2d 896, 898 (R.I.2002), a myriad of reasons might prevent a retrial: for example, the case might settle, key witnesses might not be avail- able for a retrial, or the plaintiff might decide not to bear the cost, aggravation, or the risk of a retrial.

coercive. The trial justice emphasized the need for the jurors to retain any conscientiously held positions they might have concerning the evidence; he unequivocally informed the jurors that he would accept their impasse if a verdict could not be reached by lunchtime; and he evenly distributed the costs of a new trial between all the participants in the case. Thus, we cannot conclude that the trial justice's supplemental charge constituted reversible error in this respect. For these reasons, we hold, the trial justice's *Allen* charge, viewed in its entirety and considered under all the circumstances of this case, was not unduly coercive to members of the jury. We remind trial justices, however, that when giving *Allen* charges, they should refrain from speaking about any retrial of the case as an inevitable event when, in fact, it is only one of several possible consequences that might occur after the court declares a mistrial because of the jury's inability to reach a verdict.

### E. Issues not Preserved for Appeal

■■■■ As we have previously noted, Rule 51(b) of the Superior Court Rules of Civil Procedure provides that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." *See, e.g., Saber,* 811 A.2d at 653. "Compliance with this rule is a 'mandatory precondition' to preserving an objection to the jury instructions." *Id.* (quoting *Parrella v. Bowling,* 796 A.2d 1091, 1101 (R.I.2002)). In its brief on appeal, defendant included certain arguments challenging the trial justice's jury instructions that he failed to preserve by objecting on these grounds at the trial in accordance with Rule 51(b). For example, it attempts to assign as error an alleged instruction "that defendant ha[d] a duty to safeguard the wedding guest children" and an instruction that the jury could consider the lack of third-party involvement in the accident as evidence of negligence. Because defendant did not offer a timely and meaningful objection to these instructions at trial, as required by Rule 51(b), it waived any right to object on appeal to these instructions.

■■■ The defendant also argues on appeal that the trial justice engaged in an improper *ex parte* communication with the jury outside the presence of counsel. Here, again, however, the trial justice advised the parties' counsel of the jury's request for the court to reread its previous instructions on damages and that, in response, the trial justice had done so. But when he solicited counsel for any objections thereto, defendant failed to object. As a result, it waived any right to challenge this conduct on appeal.[12]

### V

### Plaintiff's Cross–Appeal

■■■ In her cross-appeal, the plaintiff argues that the trial justice erred in failing to award her post-judgment interest while her appeal is pending. The plaintiff argues that she is entitled to post-judgment interest while her appeal is pending under G.L.1956 § 9–21–10. Recently, this Court

---

12. Although it was error for the trial justice to respond to the jury's question without first advising counsel thereof and soliciting their input concerning how he should respond, *Rhode Island Hospital Trust National Bank v. Eastern General Contractors, Inc.,* 674 A.2d 1227, 1233–34 (R.I.1996), the court's mere rereading of the previous instruction, as requested by the jury, did not prejudice defendant. Accordingly, even if defendant had objected thereto at trial, the court's error would have been harmless in any event.

again addressed this issue in *Rhode Island Insurers' Insolvency Fund v. Leviton Manufacturing Co.*, 813 A.2d 47 (R.I.2003). We reiterate here the language of our holding in *Leviton:*

> "Although [G.L.1956] § 9–21–8 provides that postjudgment interest shall apply to every judgment for money, *Cardi Corp. v. State*, 561 A.2d 384, 388 (R.I.1989), we look to § 9–21–10 to determine when both pre- and post-judgment interest begin to accrue. * * * This Court consistently has held that for the purpose of triggering post-judgment interest, the term 'judgment' in § 9–21–10(a) 'contemplates a final judgment, one that finally adjudicates the rights of the parties, whether it is a judgment from which no appeal is taken or a judgment that is affirmed by this [C]ourt after consideration and rejection of the appellant's contentions.' " *Leviton*, 813 A.2d at 49 (quoting *Bradford Dyeing Association, Inc. v. J. Stog Tec GMBH*, 809 A.2d 468, 471 (R.I.2002)).

Because the trial justice's ruling denying the plaintiff's motion for post-judgment interest is consistent with our holding in *Leviton*, we reject the plaintiff's cross-appeal. Post-judgment interest in this case will not begin to accrue until the date when we issue this opinion and affirm the judgment on appeal.

### Conclusion

For these reasons, we deny both appeals and affirm the judgment in favor of the plaintiff.